**2 TUDOR CITY PLACE ASSOCIATES and 2 Tudor Garden Parking Corp., Plaintiffs–Appellees,**

v.

**2 TUDOR CITY TENANTS CORP., Kinney Systems, Inc., and American Savings Bank, Defendants–Appellants.**

**No. 684, Docket 90–7739.**

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1990.

Decided Feb. 5, 1991.

Nathan Z. Dershowitz, New York City
(Dershowitz & Eiger, P.C., New York City,

Jan Ira Gellis, of counsel), for plaintiffs-appellees.

Yvette Harmon, New York City (Ross & Hardies, New York City, Michelle d'Arcambal, of counsel), for defendant-appellant 2 Tudor City Tenants Corp.

Before OAKES, Chief Judge, and LUMBARD and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

The plaintiffs, 2 Tudor City Place Associates (Associates) and 2 Tudor Garden Parking Corp. (Parking), brought suit against 2 Tudor City Tenants Corp. (Tenants) in the Southern District of New York to prevent the nullification of the lease (between Tenants and Parking) of a parking garage at 2 Tudor City Place.[1] Tenants, a cooperative association, had nullified the lease pursuant to the Condominium and Cooperative Abuse Relief Act (Act), 15 U.S.C. § 3607 (1988). The purchasers of the apartments at 2 Tudor City Place believed that they had not been advised that the lease of the garage to Parking improperly benefited the developer of the cooperative project at the expense of Tenants.

The complaint alleged both an illegal § 3607 termination and common law proxy fraud. Upon cross-motions for summary judgment, Judge Griesa granted plaintiffs' motion as to the § 3607 claim, and denied Tenants' motion. After entering judgment in favor of Associates and Parking, the district court granted Tenants' motion for certification to this court under Fed.R. Civ.P. 54(b).

On appeal, Tenants claims that the district court erred in holding that Tenants had no power to terminate the parking garage lease between Tenants and Parking. We agree and reverse the judgment, and direct entry of judgment in favor of Tenants on the § 3607 claim.

I.

The material facts are undisputed. 2 Tudor City Place is a 333 unit residential complex at 330 East 41st Street, east of Second Avenue. On April 4, 1981, Associates, a partnership, purchased 2 Tudor City Place and an adjacent parking garage. It acquired the ground lease, but not ownership of the land. In that same month, Associates incorporated Parking. The officers and directors of Parking consisted of the principals of Associates. Associates leased the garage to its shell corporation, Parking, which in turn, subleased it to Frances Corrao, the garage operator at that time. The lease between Associates and Parking provided that if ownership of the garage changed, the new owner would replace Associates as lessor if the new owner assumed the covenants in the lease.

On August 5, 1982, the principals of Associates incorporated Tenants. Associates intended to profit from its development of the 2 Tudor City property by selling the shares of Tenants to purchasers of the apartments. Tenants adopted a pre-incorporation contract with Associates whereby Associates sold the building and parking garage to Tenants. The contract transferred to Tenants the leases to which Associates had become a party prior to its sale of 2 Tudor City Place to Tenants. However, the terms of this contract provided that Associates remained free to alter the terms of these leases, which included the lease to the parking garage, subject only to written approval by the party to be charged with the alteration. That is, Associates could change the leases as long as Tenants approved. The effect of such a provision was that until Associates divested itself of a majority of the shares in Tenants, it had unlimited power to alter the terms of the garage lease.

On November 5, 1982, as part of the cooperative conversion process, Associates filed a preliminary prospectus with the New York Attorney General's office, as required by state law. On November 16,

---

1. Kinney System, Inc. and American Saving Bank were both named as defendants in the amended complaint. However, plaintiffs did not move for summary judgment against those parties.

1983, an Offering Plan, similar to a securities registration statement, was accepted for filing by the Office of the Attorney General. It revealed that Tenants had leased the parking garage to Parking. It also disclosed the amount of rent Parking was to pay Tenants, that Tenants was responsible for major repairs to the garage and that the ultimate expiration date of the lease was April 30, 2040, with a right to extend the lease if the ground lease is renewed. Although the Offering Plan revealed that the rent Parking was to pay Tenants under the lease was then $340,000 annually,[2] it did not reveal the market value of the garage lease. Parking presently collects $775,000 annually from Kinney Systems, Inc., the sub-lessee and current garage operator. Thus, for at least fifty years, Tenants is bound to a lease under which the rent it receives will almost certainly be substantially less than the market value of the garage.

Associates held two closings at which it sold cooperative shares to unit-owner investors in Tenants: on July 24, 1985, it divested itself of 106 of the 333 units, and 103 of the remaining units were sold on October 1, 1985. At the first closing, Associates and Tenants executed an assignment and assumption whereby the rights and duties of Associates as landlord of the garage lease were transferred to Tenants.

On July 17, 1987, the shareholders of Tenants voted to terminate the garage lease with Parking pursuant to § 3607. On August 13, 1987, Associates and Parking brought this action claiming that Tenants had no right to terminate the lease.

The provision of the Condominium and Cooperative Abuse Relief Act under which Tenants terminated the lease, § 3607, provides a non-judicial remedy for cooperative associations when the developer, or an affiliate of the developer, has bound the cooperative association to a contract, prior to the time when the developer sells control of the cooperative to the unit-owner purchasers. In such cases, the cooperative association may, by a two-thirds vote of the unit-owners, terminate the contract within two years of the time when the developer, or its affiliate, has relinquished control of the association or owns less than twenty-five percent of the apartments in the project.

The district court found that the assignment and assumption of the garage lease, executed concurrently with the July 24, 1985 closing, terminated the old lease and created a second lease. Instead of one garage lease, the district court termed the pre-assignment and assumption portion of the lease the "pre-closing lease", and held that as a result of the assignment and assumption, a second "garage lease" was created. Judge Griesa further held that because Tenants was not a party to the "pre-closing lease", signed by Associates and Parking, it had no power to terminate that lease under the authority of the Act.

## II.

■ Tenants contends that the district court erred by holding that it had no power to terminate the garage lease. We agree. There is only one garage lease relevant to this case. That lease was originally executed by Associates, as lessor, and its related shell corporation, Parking. After the 1985 assignment and assumption, Tenants came to stand in Associates' place as lessor of the garage to Parking.

The garage lease, initially signed by Associates and Parking in 1981, provided that in the event ownership of the garage should change, the purchaser would become the new landlord if it assumed all the obligations of Associates. At the first closing in 1985, Tenants, still under the control of Associates, agreed to assume these responsibilities and thereby it became the lessor of the garage. The lease further provided that "[t]he covenants and agreements contained in this Lease shall bind and inure to the benefit of [the current lessor's] successors and assigns." Thus, by its terms, the lease expressly allowed for the assignment and assumption of the lessor's rights and duties.

Associate argues that Tenants was not an original party to the Associates–Parking

---

**2.** Under the lease, the annual rent escalates $10,- 000 every five years.

lease, and hence could not terminate it. To the contrary, if the formality of which party signed the operative document in § 3607 terminations was given legal effect, it would undermine the policy of the Act. Pre-conversion leases and contracts executed by the developer and its affiliates, such as tenant cooperatives with yet unsold shares, are self-dealing agreements. The developer stands on both sides of the bargaining table because it still controls its affiliate. Because the developer controls all parties at the pre-conversion stage, it can, as Associates did, enter into a self-dealing contract with an affiliate and then transfer its contractual obligations to a cooperative association. Not to apply § 3607 merely because the developer has altered the form of its self-dealing transactions would provide an easy avenue for avoidance of that provision of the Act, the purpose of which was to "alleviate developer abuses during the conversion process." *West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 190 (2d Cir.), *cert. denied* 484 U.S. 850, 871, 108 S.Ct. 151, 200, 98 L.Ed.2d 107, 151 (1987).

The recent decision in *Coliseum Park Apartments Co. v. Coliseum Tenants Corp.*, 742 F.Supp. 128 (S.D.N.Y.1990) is in accord with our conclusion. In that case, as here, the garage lease at issue had been executed by the sponsor and its affiliate before the formation of the tenant cooperative and the filing of the offering plan with the state Attorney General, and the lease provided that the new owner would become the lessor in the existing garage lease if the new owner assumed its obligations. Unlike the case at bar, there was no assignment and assumption agreement passing the rights and duties of the sponsor/landlord to the tenant corporation. Nevertheless, Judge Leisure held that at the closing, the cooperative became the party to the garage lease with the developer's affiliate, and therefore, the lease could be terminated by the cooperative association because it was between the sponsor's affiliate and the cooperative association. *See also Bank of New York, Albany v. Hirschfeld*, 37 N.Y.2d 501, 506, 374 N.Y.S.2d 100, 103, 336 N.E.2d 710, 712, (1975) (similar lease provi-

sion held to transfer rights and obligations of lessor to purchaser of real estate upon purchaser's failure to object to lease covenants). Tenants became the lessor of the garage when it assumed the duties of landlord in 1985 in accordance with the terms of both the lease and the assignment and assumption. Hence, it had the power under § 3607 to terminate the lease with Parking.

### III.

■ Associates contends that § 3607 does not apply to leases because the text of the section references only "contracts". There is no merit to this contention. Nothing in the extensive legislative history of the Act suggests that Congress meant to exclude leases from the term "contract". The lease was a contract which provided for the "operation, maintenance and management" of a garage which "serv[ed] the ... cooperative unit owners." 15 U.S.C. § 3607(a)(1). As we recently held in *West 14th St.*, § 3607 covers leases as a species of "contract". 815 F.2d at 197–98. Thus, Tenants could avail itself of the termination remedy under the Act.

### IV.

■ Further, the undisputed facts in the record show that the lease falls within the limitations prescribed in §§ 3607(a)(1)–(4), and accordingly Tenants was empowered to terminate the garage lease. Section 3607(a) provides:

Any contract or portion thereof which is entered into after October 8, 1980, and which—

(1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;

(2) is between such unit owners or such association and the developer or an affiliate of the developer;

(3) was entered into while such association was controlled by the developer through special developer control or

because the developer held a majority of the votes in such association; and

(4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer,

may be terminated without penalty by such unit owners or such association.

Beyond any doubt, the garage serves the cooperative unit-owners as required by § 3607(a)(1). In *West 14th St.*, we held that a parking garage was "property serving the ... cooperative unit owners," § 3607(a)(1) even though the garage did not exclusively serve residents of the building. 815 F.2d at 198–99. To hold otherwise, as Judge Cardamone noted, would permit developers to avoid § 3607 simply by opening a limited number of garage spaces to the public. *Id.* at 198.

After reviewing the statute's legislative history, we concluded in *West 14th St.* that the property need only primarily benefit the unit-owners. 815 F.2d at 198. Tenants' Certificate of Occupancy gave a preference to unit-owners for garage spaces. Because the garage primarily served Tenants, the lease was of the type covered by § 3607(a)(1).

We find that the three other criteria of § 3607(a) are also satisfied. Section 3607(a)(2) requires that the contract be between the "unit owners or such association and the developer or an affiliate of the developer." Section 3603(1) defines affiliate as "any person who controls, is controlled by, or is under common control with a developer." [3]

■ The garage lease was between Tenants and Parking. Parking was incorporated by the principals of the developer, Associates. At all relevant times, the officers and shareholders of Parking were the principals of Associates. Such control of Parking renders it an affiliate of Associates. *See* 15 U.S.C. § 3603(1). Hence, the lease between Parking and Tenants falls within § 3607(a)(2).

Section 3607(a)(3) requires the contract to have been entered into when the developer controlled the cooperative association. Here, Tenants became a party to the lease on July 24, 1985 when it assumed the garage lease. As discussed *infra*, Tenants was under "special developer control" until October 30, 1985, when the unit-owners elected an independent board of directors. Thus, as required by § 3607(a)(3), the lease was "entered into while such association was controlled by the developer through special developer control."

Section 3607(a)(4) states that the contract must extend for at least three years, including any automatic renewal provisions. Here, the garage lease does not expire until April 2005, with automatic renewal by Parking for successive terms of twenty and fifteen years.

Tenants has shown that the parking garage lease was terminable under §§ 3607(a)(1)–(4).

### V.

■ The lease was terminated by the unit-owners within two years of the termination of "special developer control", by a two-thirds vote, as required by § 3607(b).

Section 3607(b) provides that contract termination by the unit owners must occur within two years of the termination of

**3.** Control is defined by § 3603(1):

A person "controls" a developer if the person (A) is a general partner, officer, director, or employer of the developer, (B) directly or indirectly or acting in concert with one or more other persons, or through one or more subsidiaries, owns, controls, holds with power to vote, or holds proxies representing, more than 20 per centum of the voting interest of the developer, (C) controls in any manner the election of a majority of the directors of the developer, or (D) has contributed more than 20 per centum of the capital of the developer.

A person "is controlled by" a developer if the developer (i) is a general partner, officer, director or employer of the person, (ii) directly or indirectly or acting in concert with one or more other persons, or through one or more subsidiaries, owns, controls, holds with power to vote, or holds proxies representing, more than 20 per centum of the voting interests of the person, (iii) controls in any manner the election of a majority of the directors, or (iv) has contributed more than 20 per centum of the capital of the person.

"special developer control" or when the developer owns only twenty-five percent of the units or less.[4] Section 3607(d) declares that the termination is not effective until ninety days after mailing notice of the requisite two-thirds unit-owners vote. Because Associates owned more than twenty-five percent of the units during all relevant time periods, it is necessary to determine when "special developer control" terminated.

The § 3607 termination vote occurred on June 17, 1987. On June 18, the termination notice was mailed to Associates. Under § 3607(d), it became effective ninety days later on September 16, 1987. For the notice to have been timely, "special developer control" must have existed at least until September 16, 1985.

Section 3603(22) defines "special developer control" as any right arising under state law or by way of a written instrument whereby the developer has power to control the cooperative association. It excludes from this definition the mere ownership of shares allocable to the units still owned by the developer. Thus, Associates claims that "special developer control" terminated on July 24, 1985, the date of the first closing. On that date, 22,985 shares allocable to 106 apartments were sold to shareholders. Although Associates still held a majority of the shares in Tenants, this was not a relevant factor according to § 3603(22). Conversely, Tenants asserts that "special developer control" terminated on October 30, 1985, when the first independent board of directors was elected.

■ Special developer control did not terminate until Tenants elected an independent board of directors. In *West 14th St.*,

we equated "special developer control" with developer domination of the cooperative board of directors. 815 F.2d at 200. In addition, both *Brabert Realty Co. v. 20125 Owners Corp.*, 703 F.Supp. 314, 316–17 (S.D.N.Y.1989) and *181 East 73rd Street Co. v. 181 East 73rd Tenants Corp.*, 87 Civ. 3362, 1988 WL 45634 (S.D.N.Y. May 2, 1988) have held that the developer exercises "special developer control" when it dominates the cooperative's board of directors. In the case at bar, the unit-owners did not elect an independent board of directors until October 30, 1985. Therefore, the effective date of the leasehold termination, September 16, 1987, is within the two year limitation of § 3607(b), and is timely.[5]

VI.

■ The disclosure of the lease and its terms in the Offering Plan did not deprive Tenants of its right to terminate the lease, as Associates argues.

Facially, the statute is devoid of any indication of a disclosure defense. To read such a defense into the statute would render § 3607 little more than a disclosure statute. In addition, it is unrealistic to expect prospective homeowners to understand all the financial data revealed in the offering materials. The average cooperative buyer is vulnerable to the practices of developers who may bury the hidden costs of self-dealing contracts in lengthy, legally-mandated disclosure documents. Indeed, in this case, Associates, disclosed the rent and the long-term nature of the lease in the midst of its 607 page Offering Plan. Yet, it did not disclose the disparity between the

4. Section 3607(b), in its entirety, states:

Any termination under this section may occur only during the two-year period beginning on the date on which—
(1) special developer control over the association is terminated; or
(2) the developer owns 25 per centum or less of the units in the conversion project, whichever occurs first.

5. Associates also makes a related argument that Tenants did not terminate the lease in a timely manner given the six year statute of limitations

in 15 U.S.C. § 3613 (1988). However, § 3613 reads:

No *action* shall be maintained to enforce any right or liability created by this chapter unless brought within six years after such action accrued ....

(emphasis added). It is Associates, not Tenants, which seeks to enforce rights under the Act. Section 3613 does not set a limitation on the time for contract termination under § 3607, a non-judicial remedy. Rather, it is § 3607(b) that serves as a time limitation on such terminations.

garage's market value and the rent Parking was to pay Tenants. The Offering Plan merely stated that Associates expected, "to make a profit with respect to the Garage Lease in the future." Only a legal or real estate expert could discern the possible extent of such profit. The amount of this profit would not become known to the typical purchaser of Tenants shares until Associates relinquished control of Tenants, and an independent board of directors was elected.

In *West 14th St.*, we rejected the developer's contention that § 3607 was inapplicable because the contracts were the result of negotiations with the tenant group. 815 F.2d at 200–201. The situation presently before the court is a more compelling case for allowing a § 3607 termination. Unlike *West 14th St.*, there was no direct disclosure in negotiations. The only disclosure of the self-dealing lease was buried in the offering materials. *See also Coliseum Park*, 742 F.Supp. 128 (S.D.N.Y.1990) (declining to construe § 3607 as having a disclosure defense).

### VII.

 The provisions of § 3607 which authorize the termination of developer dominated arrangements do not violate the fifth amendment proscription that "private property [shall not] be taken for public use without just compensation."

Congress passed the Act in 1980. The garage lease was executed the following year. Laws and statutes in existence at the time a contract is executed are considered a part of the contract, as though they were expressly incorporated therein. Hence, the Act does not violate the takings clause.

### VIII.

Judge Griesa disposed of this case below by granting Associates' motion for summary judgment and denying Tenants' motion for summary judgment. Associates argues that even if we reverse the district court's judgment in its favor, summary judgment in favor of Tenants should not be directed because there are material issues of fact relating to whether Tenants' proxy statement was fraudulent and whether Tenants' board of directors ratified the garage lease. We disagree.

Associates has not alleged any facts to support the proxy fraud and ratification claims, it relies instead on Fed.R.Civ.P. 56(f), which gives the district court discretion in denying summary judgment when it appears from the non-movant's affidavits that more discovery is necessary before a decision should be made.

Rule 56(f) is of no aid to the plaintiffs. Even if Associates was allowed to conduct discovery as to proxy fraud and ratification, those claims do not constitute a defense to a § 3607 termination. The Act is devoid of any indication that state law claims serve as a supplement to what Congress enacted. The only procedural requirement for the termination vote is that two-thirds of the unit-owners, exclusive of units owned by the developer, must approve of the termination. 15 U.S.C. § 3607(c). Associates has not alleged that this requirement was not met. The other points advanced by Associates and Parking do not merit discussion.

### IX.

There being no issue of material fact, the judgment of the district court is reversed with instructions to grant summary judgment in favor of Tenants on the § 3607 claim.