954 F.2d 45
 181 EAST 73RD STREET CO., Plaintiff-Appellant-Cross-Appellee,
v.
181 EAST 73RD TENANTS CORP., Defendant-Appellee-Cross-Appellant.
 Nos. 166, 294, Dockets 91-7426, -7496.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 9, 1991.
Decided Jan. 10, 1992.
 
 Robert Zastrow, New York City (Karen S. Jore), Gregory R. Belcamino, Stroock & Stroock & Lavan, of counsel), for plaintiff-appellant-cross-appellee.
 Diane Serafin Blank, New York City (Paula G.A. Ryan, Parker Duryee Rosoff & Haft, of counsel), for defendant-appellee-cross-appellant.
 Before OAKES, Chief Judge, VAN GRAAFEILAND and NEWMAN, Circuit Judges.
 OAKES, Chief Judge:
 
 
 1
 We must decide in this appeal to whom Congress accorded the right to terminate a self-dealing lease pursuant to section 3607 of the Condominium and Cooperative Abuse Relief Act of 1980, 15 U.S.C. §§ 3601-3616 (1988) ("Abuse Relief Act") and who may waive that right. The case arises from a conversion of a twenty-story building, located at 181 East 73rd Street in Manhattan, from rental property to cooperative ownership. The building contains 116 apartments and street-level commercial property, including three stores, a restaurant, and a parking garage. Plaintiff 181 East 73rd Street Co. ("Sponsor"), the former owner of the building, sponsored the conversion,[1] and defendant 181 East 73rd Tenants Corporation ("Tenants Corporation") acquired title to the building. As part of the conversion plan, Tenants Corporation--still controlled by officers and directors appointed by Sponsor--executed a ninety-nine year Master Lease that demised the commercial property back to the Sponsor.
 
 
 2
 The shareholders of Tenants Corporation subsequently voted to terminate, pursuant to section 3607 of the Abuse Relief Act, the portion of the Master Lease that covered the fifty-two car parking garage. Sponsor brought a declaratory judgment action challenging the validity of the termination on the grounds that Tenants Corporation had waived its termination right.[2] In addition, Sponsor sought damages and rent reduction. Tenants Corporation counterclaimed, seeking attorneys' fees and a declaratory judgment as to both the validity of the termination of the garage portion of the Master Lease and the unconscionability of the entire Master Lease under New York law. Both parties moved for summary judgment. Judge Richard Owen of the United States District Court for the Southern District of New York granted Tenants Corporation's motion finding that the termination was valid, denied both the unconscionability and attorneys' fees claims, and, following a hearing and a report by a magistrate, granted Sponsor's claim for rent apportionment. Sponsor appeals the district court's ruling that the lease termination was valid and Tenants Corporation cross-appeals the denial of attorneys' fees.
 
 I.
 
 3
 In New York, a typical cooperative or condominium conversion commences with the distribution of an offering plan to tenants who reside in the building.[3] Through the offering plan a sponsor seeks to solicit the statutorily required percentage of subscription agreements from current residents of the target building. N.Y.Gen.Bus.Law § 352-eeee(2)(c)-(d) (McKinney 1984) (governing conversions in New York City). The Sponsor, in compliance with this procedure, submitted a preliminary offering statement to the New York State Attorney General in 1984. The Attorney General rejected the plan on the grounds that the rent specified in the Master Lease would not keep pace with the costs of maintaining the space.
 
 
 4
 After the Attorney General approved an amended plan the building tenants formed an association to negotiate additional amendments to the plan. The association gathered "no-buy" pledges from over 85% of the current tenants, thus, blocking conversion under an eviction plan.[4] The pledges forced Sponsor to negotiate with the tenants' association before the conversion could proceed. Following negotiation, the parties agreed upon, among other terms, a ninety-nine year Master Lease of the commercial properties at a fixed annual rent plus 19.5% of the rent increases Sponsor received through subletting the property.
 
 
 5
 On May 15, 1985, the closing occurred and the Master Lease was executed. At the time of the closing, Tenants Corporation was still controlled by Sponsor; however, on June 10, 1985, the tenants elected a new board of directors, replacing Sponsor's nominees.
 
 
 6
 By 1987, the Master Lease had become a drain on the resources of Tenants Corporation. The Master Lease did not require Sponsor to assume a share of taxes, operating expenses, or services required to maintain the commercial property; as a result of a disproportionate escalation of these costs, Tenants Corporation found itself bound to a long-term lease under which there was an ever-increasing disparity between the rent received and the market value of the properties. In early May 1987, more than two-thirds of the unit holders who held residential units in the building voted to terminate the garage portion of the Master Lease pursuant to section 3607. Notice of Termination was sent to Sponsor on May 8, 1987.
 
 
 7
 For our purposes, the story might have ended here if not for the discovery of asbestos on the premises of the building. On June 28, 1985, an inspection of the building by the New York City Department of Health revealed asbestos in the garage, boiler room, basement, laundry room, and penthouse patios. The inspector issued a Notice of Violation. On July 22, 1985, the Department of Health ordered the abatement of the asbestos conditions. This order sparked debate as to whether Sponsor or Tenants Corporation was financially liable for the abatement.
 
 
 8
 On October 25, 1985, the President of Tenants Corporation and a representative of Sponsor signed a letter agreement ("asbestos agreement") that Sponsor would pay roughly two-thirds of the cost of asbestos removal, and Tenants Corporation would pay the remaining one-third. The asbestos agreement, in pertinent part, stated that:
 
 
 9
 The Tenants Corp. specifically retains and reserves its right to claim any non-asbestos related defaults of the Lease or Cooperative Plan by the Sponsor.
 
 
 10
 Except as set forth herein, the Lease remains unmodified and is hereby ratified and confirmed, and remains in full force and effect. The Tenants Corp. and the Sponsor represent that to the best of their knowledge no defaults presently exist under the Lease and there are no defenses, offsets, or counterclaims against the enforcement by Tenants Corp. of any of the agreements, terms, covenants or conditions of the Lease.
 
 
 11
 Joint Appendix 131, 132 (emphasis added). The central issue before us is whether the above language resulted in ratification of the Master Lease and, thus, in effect, constituted a waiver of the unit holders' section 3607 right to terminate a self-dealing lease.
 
 II.
 
 12
 The Abuse Relief Act seeks to eliminate the potential for abuse to which the conversion process lends itself. Congress undertook the delicate task of deterring these abuses without preventing conversions from taking place. See 15 U.S.C. § 3601(a)(3), (b) (1988); H.R.Conf.Rep. No. 1420, 96th Cong., 2d Sess. 162-63 (1980), reprinted in 1980 U.S.Code Cong. & Admin.News pp. 3506, 3617, 3707-08. Section 3607 of the Abuse Relief Act targeted a particular form of abuse to which tenants were vulnerable, namely, self-dealing leases arranged by sponsors. Sponsors have an economic incentive to take advantage of the temporary control they exert over tenants' corporations to bind tenants to long-term, self-dealing leases--leases that potentially deprive the tenants of valuable assets. Congress chose to counteract this powerful potential for abuse by arming the new unit holders of a conversion project with an equally potent weapon, the federal right to terminate self-dealing leases without having to resort to judicial action. See H.R.Conf.Rep. No. 1420, 96th Cong., 2d Sess. 168 (1980), reprinted in 1980 U.S.Code Cong. & Admin.News pp. 3617, 3713.
 
 
 13
 Section 3607 creates a two-year window during which unit holders of a tenants' corporation can bring hindsight to bear on the question whether certain leases and contracts with the sponsor constitute the best use of their collective assets. No proof of one-sidedness or unconscionability is required for the exercise of the termination right. See West 14th Street Commercial Corp. v. 5 West 14th Street Owners Corp., 815 F.2d 188, 200-01 (2d Cir.), cert. denied, 484 U.S. 850 & 871, 108 S.Ct. 151 & 200, 98 L.Ed.2d 107 & 151 (1987). Nor does negotiation between prospective unit holders and the developer, as occurred in the present case, render the termination right inapplicable. Id. The Abuse Relief Act extends the right to any contract[5] that: (1) provides for the operation of the condominium or cooperative association or concerns property serving the unit holders; (2) is between the unit holders or the tenants corporation and the developer or an affiliate of the developer; (3) was entered into while the tenants corporation was controlled by the developer; and (4) extends for a period of more than three years.[6] To invoke the termination right, two-thirds of the unit holders must approve the termination[7] within two years of the earlier of two events: the date on which developer control ceases or the date on which the developer owns 25% or less of the units.[8]
 
 A. Application of the Statutory Elements
 
 14
 If we set aside for the moment the alleged ratification of the Master Lease by Tenants Corporation, the undisputed record reveals that the parking garage portion of the Master Lease falls within the reach of the section 3607 termination right. The on-site parking garage constitutes "property serving the ... cooperative unit owners," which satisfies the first element of section 3607(a). See West 14th Street, 815 F.2d at 198-99. The Master Lease was entered into between Sponsor--a developer as defined by section 3603(14)--and Tenants Corporation--a cooperative association as defined by section 3603(9)--which satisfies the second requirement of section 3607(a). Because directors appointed by Sponsor controlled Tenants Corporation when the contracts were signed, Tenants Corporation was under "special developer control," as defined by section 3603(22), at the time the contracts were entered into; thus, the third element of section 3607(a) is satisfied. See 2 Tudor City Place Assoc. v. 2 Tudor City Tenants Corp., 924 F.2d 1247, 1253 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991). The ninety-nine year Master Lease satisfies the fourth requirement of section 3607(a), that the lease be of more than three years' duration.
 
 
 15
 The parties similarly agree that the manner in which Tenants Corporation invoked the termination right satisfied section 3607(b)-(d): the lease was terminated by a two-thirds vote of the unit holders within two years of the termination of special developer control, and the requisite notice was delivered to Sponsor.[9] The case before us arises over the effect of the ratification language in the asbestos agreement.
 
 B. Ratification and Waiver
 
 16
 Underlying this dispute are divergent interpretations of who holds the section 3607 termination right; the parties, consequently, arrive at different answers to the question of who may waive that right by ratifying a self-dealing lease. Sponsor contends, in effect, that the termination right is held by the Tenants Corporation; thus, ratification by the Board of Directors in the asbestos agreement removed the lease from the realm of self-dealing leases, constituting a waiver of the termination right. Sponsor, in essence, characterizes the situation as analogous to a corporation adopting promoters' pre-incorporation contracts. In contrast, Tenants Corporation argues that the termination right belongs solely to the unit holders, and, accordingly, only they may waive that right.
 
 
 17
 According to Sponsor, once a tenants' corporation is controlled by an independent board of directors, the board may ratify self-dealing leases. Such a ratification constitutes a waiver of the termination right. In support of this argument, Sponsor relies on West 14th Street, in which we stated in dicta that, in certain circumstances, ratification might bind a corporation to a contract. West 14th Street, 815 F.2d at 199-200.
 
 
 18
 Sponsor's argument is problematic, even if we were to accept its account of ratification. Although the Board of Directors of Tenants Corporation authorized its President to sign an asbestos agreement, as the district court noted, no vote was taken by the Board on whether to ratify the Master Lease. Even the West 14th Street account of ratification does not permit inadvertent waiver of the termination right, but instead requires a vote by the Board on the matter of the adoption of a contract. West 14th Street, 815 F.2d at 200.
 
 
 19
 Furthermore, we offered the discussion of ratification in West 14th Street in the context of determining the parties to a contract, within the meaning of the Abuse Relief Act. In this appeal, Sponsor seeks to apply this teaching to the distinct issue of who may waive the termination right. To equate these issues masks the complexities of the newly-fashioned federal termination right by applying the traditional jurisprudence of pre-incorporation contracts to a novel situation.
 
 
 20
 By means of a convoluted argument, the sponsor in West 14th Street contended that contracts that had been signed by the sponsor and the tenants' corporation were in fact between the developer and a tenants' group that had negotiated amendments to the offering plan, and thus the contracts did not satisfy the second requirement of section 3607(a). This argument, if followed to its logical conclusion, would have proved more than the sponsor wanted--the tenants' corporation would not have been legally bound by the contracts. The sponsor sought to avoid this pitfall by arguing that the tenants corporation had ratified the contract when 80% of the tenants of the building purchased shares in the cooperative. We rejected the ratification portion of this argument on the grounds that:
 
 
 21
 Although ratification could serve to bind Owners Corp. to the contracts, see 1A W. Fletcher, Cyclopedia of the Law of Private Corporations § 210 (C.V. Swearingen rev. ed. 1983), no ratification took place. That event only occurs upon a vote of the board of directors to adopt the contracts, id.; it does not occur through the purchase of stock in the corporation.
 
 
 22
 West 14th Street, 815 F.2d at 200.
 
 
 23
 West 14th Street 's account of ratification--designed to resolve the issue whether ratification could occur through the purchase of shares in a cooperative--casts little light on the question at hand. We must decide whether ratification by the board of directors may remove a lease from the realm of self-dealing leases, an action which constitutes, in effect, a waiver of the termination right. A board of directors does not have the authority to waive a right held by the stockholders or unit holders. See 1A W. Fletcher, Cyclopedia of the Law of Private Corporations § 210 (C.V. Swearingen rev. ed. 1983) ("The directors are the central authority of the corporation to do all acts which need not be done by the whole body of stockholders ..."). Congress crafted the termination right as a right held jointly by the unit holders. To ensure that the right would be used in accordance of the will of the unit holders, Congress required a formal vote by at least two-thirds of the unit holders before the right could be exercised. This procedure reveals that Congress envisioned the right as fundamental to possession of a unit in the cooperative or condominium and intended to temper the exercise of the right through collective debate. Although Congress did not specify a procedure by which the unit holders could waive the termination right, given the assignment of the right to unit holders and the commitment to quasi-consensual exercise of that right, we can safely assume Congress did not intend to exclude the unit holders from the waiver decision. In holding that the waiver decision lies with the unit holders, however, we do not reach the related question of the procedure by which the unit holders may waive that right. The unit holders, in the matter before us, never considered whether to ratify the lease and thereby waive the termination right; therefore, no waiver occurred.[10]
 
 III.
 
 24
 Tenants Corporation argues that the district court's denial of attorneys' fees pursuant to 15 U.S.C. § 3611(d) (1988) was an abuse of discretion. The language of the Abuse Relief Act does not support this contention. According to section 3611(d), "[a] defendant may recover reasonable attorneys' fees if the court determines that the cause of action filed by the plaintiff is frivolous, malicious, or lacking in substantial merit." Sponsor's argument, which involves a novel issue concerning the interpretation of a recently created right, defies the label "frivolous, malicious, or lacking in substantial merit."
 
 
 25
 Tenants Corporation argues that we should not be bound by the language of section 3611: Congress sought to fashion a nonjudicial remedy to self-dealing leases and when suits seek to burden the exercise of that right, the Abuse Relief Act's fee provision should be interpreted in a fashion similar to discretionary attorneys' fee statutes such as 42 U.S.C. § 1988 (1988). According to Tenants Corporation, in a rightsburdening situation, fees should be recovered unless such an award would be unjust. We disagree. Tenants Corporation's argument depends upon the characterization of Sponsor's suit as an anomalous, rights-burdening action. However, Congress, in creating a nonjudicial remedy to self-dealing leases, envisioned a sponsor's declaratory judgment action contesting the validity of lease terminations as the norm. See Cast Iron Co. v. Cast Iron Corp., 707 F.Supp. 655, 656 (S.D.N.Y.1988). Thus, congressional intent does not indicate the need for a rights-burdening exception to the fees provision. Absent congressional intent to the contrary, unambiguous statutory language controls. See Ford Motor Credit Co. v. Cenance, 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981) (per curiam). And in this case, congressional intent and the unambiguous statutory language are in harmony--a party may recover attorneys' fees under the Abuse Relief Act only if the suit is lacking in substantial merit.
 
 
 26
 Affirmed.
 
 
 
 [1]
 A sponsor is "any person, partnership, joint venture, corporation, company, trust, association or other entity who makes or takes part in a public offering or sale ... of securities consisting primarily of shares or participation interests or investment in real estate, including cooperative interests in realty." 13 N.Y.C.C.R.R. § 18.1(c)(1) (1984)
 
 
 [2]
 Plaintiff's complaint arises under 15 U.S.C. §§ 3607, 3611-3612 (1988); therefore, subject matter jurisdiction rests upon 28 U.S.C. § 1331 (1988). See West 14th St. Commercial Corp. v. 5 West 14th St. Owners Corp., 815 F.2d 188, 191-96 (2d Cir.), cert. denied, 484 U.S. 850 & 871, 108 S.Ct. 151 & 200, 98 L.Ed.2d 107 & 151 (1987)
 
 
 [3]
 The term "offering plan" connotes a two-step process. First, the sponsor submits a preliminary offering statement or "red herring" to the New York State Attorney General's Office for approval. The sponsor also must notify all current tenants of the conversion proposal and provide them with a copy of the statement. Second, once the Attorney General's office approves the preliminary offer, the sponsor may issue the final offer--known as the "black book"--and solicit acceptance agreements. N.Y.Gen.Bus.Law §§ 352-e(2), 352-eeee(2)(f) (governing conversions in New York City) (McKinney 1984). See generally New York State Attorney General, Cooperative and Condominium Conversion Handbook 8-15 (1989) (hereinafter Conversion Handbook ); Comment, Cooperative and Condominium Conversions in New York: The Tenant in Occupancy, 31 N.Y.L.Sch.L.Rev. 763, 764-65 (1986)
 
 
 [4]
 New York law permits two forms of conversion plans, eviction and non-eviction plans. An eviction plan, which requires that 51% of the tenants in occupancy on the date the Attorney General approves the offering plan for filing sign purchase agreements, provides for the eviction of non-purchasing tenants. A non-eviction plan permits non-purchasing tenants to remain in the building, but to proceed under such a plan at least 15% of the residential units must be purchased by either current tenants or purchasers who plan to live in the unit. N.Y.Gen.Bus.Law § 352-eeee(2)(c)-(d) (McKinney 1984); see also Conversion Handbook, supra, at 10, 16-17
 
 
 [5]
 In West 14th Street, 815 F.2d at 197-98, we held that the term "contracts" in section 3607 encompasses leases. See also 2 Tudor City Place Assoc. v. 2 Tudor City Tenants Corp., 924 F.2d 1247, 1251 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991)
 
 
 [6]
 Section 3607(a) provides in pertinent part:
 (a) Any contract or portion thereof which is entered into after October 8, 1980, and which--
 (1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;
 (2) is between such unit owners or such association and the developer or an affiliate of the developer;
 (3) was entered into while such association was controlled by the developer through special developer control or because the developer held a majority of the votes in such association; and
 (4) is for a period of more than three years....,
 may be terminated without penalty by such unit owners or such association.
 15 U.S.C. § 3607(a) (1988).
 
 
 [7]
 Section 3607(c) provides:
 A termination under this section shall be by a vote of owners of not less than two-thirds of the units other than the units owned by the developer or an affiliate of the developer.
 15 U.S.C. § 3607(c) (1988).
 
 
 [8]
 Section 3607(b) provides:
 (b) Any termination under this section may occur only during the two-year period beginning on the date on which--
 (1) special developer control over the association is terminated; or
 (2) the developer owns 25 per centum or less of the units in the conversion project,
 whichever occurs first.
 15 U.S.C. § 3607(b) (1988).
 
 
 [9]
 According to 2 Tudor City, the effective date of termination, ninety days after notice thereof is provided to the sponsor, see 15 U.S.C. § 3607(d) (1988), must be within two years of the cessation of special developer control. 2 Tudor City, 924 F.2d at 1253. If this means of calculating the two-year window is applied to the instant termination, it is possible to argue that the effective date of termination was untimely. This argument was not made by the parties and we decline to raise it sua sponte. In any event, the date of the notice of termination rather than its effective date may be the critical date for limitations purposes, despite the 2 Tudor City assumption to the contrary. We leave that matter for another day, when it is fully briefed and argued
 
 
 [10]
 Because the Board was incapable of waiving the termination right, we need not consider the issue of whether waiver of matured claims under the Abuse Relief Act, see Korn v. Franchard Corp., 388 F.Supp. 1326, 1329-30 (S.D.N.Y.1975)--even if knowingly made by the unit holders--is so inconsistent with section 3614 of the Abuse Relief Act as to be void. We also do not reach the question of whether the unit holders may waive the termination right in the process of adopting a larger agreement, such as an asbestos agreement, or whether they must expressly consider the waiver decision