**BARNAN ASSOCIATES, Plaintiff,**

v.

**196 OWNER'S CORP., Defendant.**

**No. 91 Civ. 6492 (WCC).**

United States District Court, S.D. New York.

July 10, 1992.

Stroock & Stroock & Lavan, New York City (Robert Zastrow, Kelly Doyle, of counsel), for plaintiff.

Horing & Welikson, R. Emmet Delany, Forest Hills, N.Y. (Eric M. Goidel, R. Emmet Delany, Robert L. Gordon, of counsel), for defendant.

### OPINION AND ORDER

CONNER, District Judge.

Plaintiff Barnan Associates brings this claim pursuant to Section 608 of the Condominium and Cooperative Protection and Abuse Relief Act of 1980 (the "Abuse Relief Act"), 15 U.S.C. § 3601 *et seq*, seeking equitable relief against defendant 196 Owner's Corp. Defendant counterclaims pursuant to the Abuse Relief Act and under several state law theories of recovery. This action is presently before the Court on plaintiff's motion, and defendant's cross-motion, for summary judgment pursuant to Rule 56(c), Fed.R.Civ.P.

### BACKGROUND

On May 25, 1979, the principals of Robert Olnick Associates (the "Sponsor") acquired fee title to 196 East 75th Street, New York, New York (the "Building"). Plaintiff Barnan Associates acquired its leasehold interest as tenant from the Sponsor by a written lease, dated August 31, 1979 (the "Master Commercial Lease"). The property subject to the lease is currently used as a parking garage and as retail space. The retail space is subleased to a tanning salon, a shoe repair shop, a ladies' fashion store, and a store selling pictures and frames. At all relevant times, the Sponsor and plaintiff have been under common control.

In 1980, the Attorney General for the State of New York accepted for filing an offering plan for the cooperative conversion of the Building (the "Plan"). The

Sponsor declared the Plan effective and converted the Building to cooperative ownership, with title thereto being conveyed to defendant 196 Owner's Corp. on June 8, 1981. At the closing, approximately 46% of the shares were issued to purchasers for personal occupancy, and the approximately remaining 54% of the shares were transferred to the Sponsor. The Sponsor assigned its interest in the Master Commercial Lease to defendant on the closing date pursuant to a written assignment, dated June 6, 1981 (the "Assignment"). The Master Commercial Lease obligates defendant to accept rentals fixed at $84,000 per year, plus rent escalations based upon real estate tax increases for an initial twenty-year term. *See* Plaintiff's Exh. A at 67.

Because the Sponsor owned a majority of the shares in the cooperative, it retained voting control of the board until the annual shareholders' meeting held on September 14, 1989. On that date, the shareholders voted for a majority of directors not affiliated with the Sponsor, and have done so at each subsequent annual meeting.

At a special shareholders' meeting held on September 13, 1991, 28,754 shares were voted in favor of terminating the Master Commercial Lease, said shares constituting 88% of those owned by shareholders, as distinguished from those owned by the Sponsor and plaintiff. Also on September 13, 1991, and pursuant to 15 U.S.C. § 3607(d), a notice of termination of the Master Commercial Lease was mailed to plaintiff, with a copy to the Sponsor. Assuming that the other requirements of Section 3607 were satisfied, that notice was effective on December 12, 1991.

Plaintiff commenced this lawsuit shortly after service of the notice seeking a declaration that defendant's termination of the Master Commercial Lease was of no force and effect. Specifically, plaintiff contends that: (1) the shareholders terminated the wrong contract, one that predated the Abuse Relief Act, and (2) the notice of termination was untimely in any event. Arguing that the notice of termination was timely given, defendant asks that summary judgment be granted in its favor terminating the Master Commercial Lease, subject to equitable apportionment rights. In the alternative, defendant asks that the action be dismissed because the notice of termination was premature.

## DISCUSSION

### The Standard for Summary Judgment

A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

### The Abuse Relief Act

The Abuse Relief Act was promulgated to abate specific abusive practices occurring in the cooperative and condominium conversion process. *See* H.R.Conf.Rep. No. 1420, 96th Cong., 2d Sess. 4, reported in 1980 U.S.Code Cong. & Admin.News 3506, at 3707. Section 608 of the Act, in particular, was a response to the activities of many developers in the 1970's who created "sweetheart" lease arrangements and self-dealing contracts as a condition of sale.

*See West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 198 (2d Cir.), *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 107 *and cert. denied*, 484 U.S. 871, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987).

The Act permits the unit owners or an association of unit owners to terminate without penalty certain long-term self-dealing contracts. It provides in pertinent part:

(a) Any contract or portion thereof which is entered into after October 8, 1980, and which—

(1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;

(2) is between such unit owners or such association and the developer or an affiliate of the developer;

(3) was entered into while such association was controlled by the developer through special developer control or because the developer held a majority of the votes in such association; and

(4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer,

may be terminated without penalty by such unit owners or such association.

15 U.S.C. § 3607(a). All four elements must exist for a contract to be terminated under the statute. *West 14th Street Commercial Corp.*, 815 F.2d at 197.

 Plaintiff argues that the notice of termination in the instant action violates the clear language of 15 U.S.C. § 3607(a) which limits the applicability of the Act to contracts entered into after October 8, 1980.[1] The notice given plaintiff provides:

PLEASE TAKE NOTICE that 196 Owner's Corp hereby terminates a certain Lease, dated August 31, 1979 by and between Robert Olnick Associates as predecessor in interest and as assignor to 196 Owner's Corp. as landlord-lessor and Barnan Associates as tenant or lessee, as assigned by a separate agreement of assignment, covering premises: a) Entire Cellar Garage area; b) Entire Street Level Store area; c) Such other areas demised by Landlord or its predecessors in interest pursuant to the terms of any and all other leases set forth upon Exhibit "B" to the lease for the building located at 196 East 75th Street, New York, New York.

Plaintiff's Exh. D. Plaintiff contends that this notice is improper since it attempts to terminate a contract entered into before the effective date of the Act.

Defendant argues, to the contrary, that the language of § 3607(a) cannot be interpreted to mean that the initial formation of the contract must have occurred after the effective date of the statute. Defendant contends that it is inconceivable that "a remedial consumer protection statute would bar a cooperative from terminating a self-dealing lease formed before the effective date of the Abuse Relief Act, where that lease is 'entered' into by the cooperative *after* the effective date of the statute." Defs. Memo. at 25–26. Accordingly, defendant insists that the operative date for purposes of analysis under the Abuse Relief Act is the date the Master Commercial Lease became binding on the unit owners— June 6, 1981.

The Court cannot agree with defendant's reading of the statute.[2] To hold that the

---

1. There is no dispute as to the satisfaction of the other criteria of Section 3607(a).

2. Defendant cites several cases in support of its assertion that the Master Commercial Lease was entered into on the date it was assigned to the cooperative. Those cases are inapposite. *Coliseum Park Apartments Co. v. Coliseum Tenants Corp.*, 742 F.Supp. 128 (S.D.N.Y.1990), on which defendant relies most heavily, simply held that on the date of conversion, the cooperative became a party to a garage lease between the sponsor and a sponsor affiliate entered into prior to the conversion, such that the cooperative had the power to terminate the lease pursuant to the Abuse Relief Act. The garage lease at issue in that case, however, had not been executed by the sponsor and its affiliate prior to October 1980; therefore, the court had no occasion to consider whether the Abuse Relief Act applies to leases executed before the statute's

lease was effectively "entered into" on the date of the Assignment would require the Court to rewrite the plain language of the statute. Clearly, the contract at issue was "entered into" when the landlord, Robert Olnick Associates, and the tenant, Barnan Associates, signed their names to a written lease in 1979. While the contract pursuant to which the cooperative assumed the landlord's obligations under the lease was entered into after the effective date of the statute, the notice of termination in the instant action attempts to terminate only the lease between Barnan and the Sponsor executed on August 31, 1979—prior to the enactment of the Abuse Relief Act.

Moreover, to interpret the statute in such a manner as would require the application of the Abuse Relief Act to a contract that preceded its effective date would raise serious constitutional questions—questions that should be avoided absent an express Congressional intent so to apply the statute. *See, e.g., Ralis v. RFE/RL, Inc.*, 770 F.2d 1121, 1126 (D.C.Cir.1985) ("But, the retrospective imposition of an obligation giving rise to a substantive liability is not likely to be undertaken absent an express Congressional intent to render unlawful an act that was legal at the time it was done."). Such an intent is clearly absent here where Congress limited the termination provision set forth in Section 3607 to contracts "entered into after October 8, 1980."

█ Even if the Master Commercial Lease were a contract to which the Abuse Relief Act's termination provisions applied, defendant's notice of termination would be ineffective, because the termination date did not fall within two years following the relinquishment of "special developer control." During a cooperative's formative years, the association, by vote of its membership and pursuant to the requirements of Section 3607(b), has the right to cancel a self-dealing contract within two years of the termination of special developer control or the time that the developer owns 25% or less of the cooperative units, whichever occurs first. 15 U.S.C. § 3607(b).[3] Termination of a contract under Section 3607(a) must be done by a vote of owners of at least two-thirds of the units other than those owned by the developer. 15 U.S.C. § 3607(c). Section 3607(d) provides that "[f]ollowing the unit owners' vote, the termination shall be effective ninety days after hand delivering notice or mailing notice by prepaid United States mail to the parties to the contract."

The two-year period begins to run when special developer control is terminated where, as in the instant case, the developer continues to hold more than 25% of the units. The Act defines special developer control as:

> any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board. A developer's right to exercise the voting share allocated to any condominium or cooperative unit which he owns is not deemed a right of special developer control if the voting share allocated to that condominium or cooperative unit is the same voting share as would be allocated to the same condominium or cooperative unit were that unit owned by any other unit owner at that time[.]

15 U.S.C. § 3603(22).

In *West 14th Street Commercial Corp.*, the Second Circuit equated special develop-

---

enactment and effective dates. Similarly, neither *2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991), nor *West 14th Street Commercial Corp.* involved a lease executed by the sponsor and its affiliate prior to the effective date of the Abuse Relief Act.

**3.** The operative provisions of the Act read:

> Any termination under this section may occur only during the two-year period beginning on the date on which—
>> (1) special developer control over the association is terminated; or
>> (2) the developer owns twenty-five per centum or less of the units in the conversion project, whichever occurs first.
> 15 U.S.C. § 3607(b).

er control with developer domination of the board of directors. 815 F.2d at 200; *see also 2 Tudor City*, 924 F.2d at 1253 ("Special developer control did not terminate until Tenants elected an independent board of directors."). Defendant in the case at bar insists, however, that while developer domination of the board may be one way of manifesting special developer control, it is not the only way.[4] According to defendant, special developer control continues to exist because an affiliate of the Sponsor is the managing agent of the cooperative pursuant to a management agreement entered into on the date of closing, which cannot be cancelled until 75% of defendant's shares are sold to purchasers for personal occupancy. Defs. Exh. A at 75.[5] Specifically, defendant notes that pursuant to the management agreement, the managing agent has the power: (1) to maintain, repair, and alter the Building without the board's consent in the event that an "emergency condition" exists; and (2) to contract for services, purchase supplies, pay bills, and control employees without full review by the board. Furthermore, defendant points to provisions in the Plan which limit the board's authority with respect to unsold shares retained by the Sponsor, as well as the board's ability to reduce the number of employees, services, equipment, and insurance coverage until 50% of the shares are owned by the tenant-shareholders. Defendant contends, therefore, that plaintiff continues to exercise control over vital and substantial affairs of the coopera-

tive such as would preclude this Court from determining that Special Developer Control has been relinquished within the meaning of the Abuse Relief Act.

In support of its position, defendant cites *Coliseum Park Apartments Co.*, 742 F.Supp. at 136, in which the court stated:

> The Association argues that in the case at bar, the individual proprietary leases, which constitute 'cooperative or condominium instruments' under § 3603(22), contain a manifold grant of powers over the Association to the Developer. These provisions allow the Developer to veto certain decisions made by the Association, *inter alia*, to increase the number or change the type of employees from those described in the Offering Plan, to restructure or to increase the amount of the indebtedness of the Association, or to make major capital improvements or to levy assessments for such improvements or repairs unless required by law. It is clear to the Court that these retained powers allow the Developer to exercise substantial control over the business affairs of the Association. Without more specific guidance from Congress or the courts, this Court must rule that such powers constitute 'special developer control' under the Act.[6]

No such broad powers are retained by the Sponsor in the instant matter. Rather, the rights to which defendant points serve only to protect the property, not to permit its disposition or substantial modification.

---

**4.** Defendant notes that New York State law requires that sponsors relinquish control of cooperative projects no later than five years from the date of conversion. *See* 13 N.Y.Codes Rules & Regs. § 18.3(v)(5)(i); *see also Park South Tenants Corp. v. 200 Central Park South Assocs.*, 941 F.2d 112, 114 (2d Cir.1991) ("Here, New York has chosen to restrict to five years the period during which developers can retain special control rights."). Because the effective date of the conversion, June 8, 1981, preceded the date of the regulation, June 2, 1982, that regulation is inapplicable to the facts of this case.

**5.** The agreement does provide, however: [n]otwithstanding the foregoing, the Apartment Corporation shall have the right to terminate the agreement at the end of any calendar month after the fourth anniversary of the date it takes effect if a majority of the mem-

bers of the Apartment Corporation's then Board of Directors and a majority of the holders of the Apartment Corporation's shares then issued and outstanding shall affirmatively vote for termination.
*Id.* at 76.

**6.** Similarly, in *Park South Tenants Corp. v. 200 Central Park South Assocs.*, 748 F.Supp. 208, 213 (S.D.N.Y.1990), *aff'd*, 941 F.2d 112 (2d Cir.1991), this Court was persuaded that the "veto power accorded defendant Sponsor ... over such items as capital improvements, employee hiring, repairs, refinancing, augmentation of the reserve fund, provision of services, equipment procurement, and building leases falls within the Act's definition of 'special developer control'...."

Defendant's citation of the management contract as a right of special developer control is equally unavailing. Congress gave shareholders the right in Section 3607 to terminate management contracts [7]—that right should not be taken away by a judicial definition of special developer control that includes management contracts as a right of such control. If the exercise of control through a management contract is considered to be special developer control, the shareholders would lose their power to terminate the contract.

Accordingly, the Court concludes that special developer control in the instant matter was relinquished on September 14, 1989—the date the shareholders elected a majority of directors not affiliated with the Sponsor.

■ Having concluded that the two-year window opened on September 14, 1989, the analysis turns on whether the actual termination, or simply the notice of termination, must be within that window. In *2 Tudor City*, 924 F.2d at 1253, the Second Circuit noted that the termination date provided in a notice of termination under the Abuse Relief Act—and not merely the shareholders' vote—must fall within the two-year window. Under the statute, the shareholders first vote; then a notice of termination is sent, which is not effective until ninety days after its transmittal. In *2 Tudor City*, the Court stated:

> The § 3607 termination vote occurred on June 17, 1987. On June 18, the termination notice was mailed to Associates.

Under § 3607(d), it became effective ninety days later on September 16, 1987. For the notice to have been timely, 'special developer control' must have existed at least until September 16, 1985.

*Id.* at 1253. *See also 69th Street & 2nd Ave. Garage Assocs. v. 301/69 Owners Corp.*, No. 91 Civ. 7966, 1992 WL 47989, at *3 (S.D.N.Y. Feb. 28, 1992) (*2 Tudor City* "holds that the termination must be effected within the two-year period. The plain language of the statute clearly indicates this result.").[8]

The Second Circuit's reasoning is supported by the plain language of the Act. A shareholders' vote in and of itself has no effect; likewise, a notice of termination is of no consequence until the specified termination date, which is ninety days after the notice is mailed or hand delivered to the parties to the contract. 15 U.S.C. § 3607(d). Applying that rule to the facts of the case before us, it is clear that the notice of termination was untimely since the effective date of termination, December 12, 1991, was more than two years after the day on which special developer control over the cooperative was relinquished—September 14, 1989.

In sum, the Court concludes that the notice of termination was of no force and effect since it attempted to terminate a contract which was entered into prior to the effective date of the Abuse Relief Act. In any event, the notice of termination was ineffective, because the termination date did not fall within two years following the

---

7. Section 3607(a) applies to any contract which "provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project...."

8. Defendant argues that only the date of the notice of termination must fall within the two-year period following the relinquishment of special developer control. In support of its contention, defendant cites *181 East 73rd Street Co. v. 181 East 73rd Tenants Corp.*, 954 F.2d 45 (2d Cir.1992). That case is inapposite. In *181 East 73rd Street*, the Second Circuit stated:

> According to *2 Tudor City*, the effective date of termination, ninety days after notice thereof is provided to the sponsor, 15 U.S.C. § 3607(d) (1988), must be within two years of the cessation of special developer control. *2 Tudor City*, 924 F.2d at 1253. If this means of

calculating the two-year window is applied to the instant termination, it is possible to argue that the effective date of termination was untimely. This argument was not made by the parties and we decline to raise it *sua sponte*. In any event, the date of the notice of termination rather than its effective date may be the critical date for limitations purposes, despite the *2 Tudor City* assumption to the contrary. We leave that matter for another day when it is fully briefed and argued.

954 F.2d at 49 n. 9. While this language may suggest that the Court of Appeals is inclined to reconsider the position it took in *2 Tudor City*, as the excerpt indicates, the Court declined to address the timeliness issue again until "it is fully briefed and argued."

relinquishment of special developer control. Accordingly, the Court grants plaintiff's motion for summary judgment. Defendant's cross-motion for summary judgment is denied.

*Defendant's State Law Counterclaims*

Because plaintiff's motion for summary judgment is granted, this Court no longer has pendent subject matter jurisdiction over defendant's state law counterclaims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court finds no diversity or other independent basis of jurisdiction to entertain any such claims. Thus, defendant's state law claims are dismissed.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The state law counterclaims are dismissed for lack of jurisdiction. The action is accordingly dismissed. SO ORDERED.