The **BOARD OF MANAGERS OF** the **CHARLES HOUSE CONDOMINIUM,** Plaintiff,

v.

**INFINITY CORPORATION and Schnurmacher Bros.,** Defendants.

**No. 92 CIV 4990 (CBM).**

United States District Court, S.D. New York.

June 30, 1993.

---

Solovay & Edlin by Norman Solovay, New York City, for plaintiff.

Kirschenbaum & Kirschenbaum, P.C. by Ira Levine, Garden City, NY, for defendants.

## OPINION ON MOTION FOR SUMMARY JUDGMENT

MOTLEY, District Judge.

Plaintiff, the Board of Managers of the Charles House Condominium (the "Board"), brought suit against defendants Infinity Corporation ("Infinity") and Schnurmacher Brothers ("Schnurmacher") seeking declaratory judgment of the termination of all of defendants' rights, title, and interest in a parking garage pursuant to the Condominium and Cooperative Conversion Protection and Abuse Relief Act, 15 U.S.C. § 3601 *et seq.* (the "Act"). Defendants subsequently brought certain counterclaims and moved for summary judgment. For the reasons discussed herein, defendants' motion and counterclaims are granted.

## I. BACKGROUND

Plaintiff is the Board of Managers of the Charles House Condominium. The Charles House Condominium was established pursuant to the provisions of the New York State Condominium Act [1] and is located in the City, County, and State of New York. The Board brought suit on behalf of the residential unit owners of the Condominium.

Defendant, Infinity Corporation ("Infinity"), is a New York corporation and sponsor of the condominium conversion.

Defendant, Schnurmacher Brothers ("Schnurmacher"), is a New York partnership.

On October 5, 1955, Schnurmacher acquired title in fee simple absolute to a parcel of land located in New York County and in or about 1958 constructed a building thereon known by street number 40 East 78th Street, New York, New York (the "Property"). The building which was constructed consists of approximately 102 residential units, commercial space for retail stores and offices, and an underground garage. It is this structure which was subsequently converted to condominium use and which is the subject of this action.

After the death of Charles Schnurmacher (one of the partners of Schnurmacher) the partnership embarked on a plan of net leasing partnership buildings and granting purchase options for cash payments so as to raise cash and settle the obligations of Charles Schnurmacher's estate. Toward this end, Schnurmacher entered into an agreement with 1001 Madison Corporation, a wholly owned subsidiary of Infinity, whereby the Property was net-leased to 1001 Madison Corporation subject to existing leases. Contemporaneously with the execution of the net-lease with 1001 Madison Corporation, Schnurmacher entered into an Option Agreement, also dated as April 5, 1984, with Infinity for a cash consideration of $6,600,000, whereby Schnurmacher granted to Infinity an exclusive and irrevocable option to purchase the Property subject to existing commercial and residential tenancies. Pursuant to paragraph 1.3 of the Option Agreement, the option may be exercised at any time during the period beginning with the death of Adolph and Irwin Schnurmacher, the two surviving partners, and ending ten (10) years from the date of the Option or, if Adolph or Irwin Schnurmacher are still alive, 47 years from November 25, 1986, whichever was earlier.[2]

---

1. New York Real Property Law, Art. 9–B § 339–d.

2. The Option Agreement stated at Section 3.2 thereof:

The Property is presently occupied pursuant to written leases referred to in Exhibit B attached hereto. Accordingly, this Agreement and the rights of optionee are subject and subordinate to the rights of tenants and subtenants, and the terms, covenants and conditions of the aforementioned leases, and the statutory rights, if any, of the tenants thereunder to renewal leases or rights to remain in the premises. Optionor represents that all non-residential leases listed in Exhibit B are in full force and effect; that to the best of Optionor's information and belief, the tenants are not in default thereun-

Subsequent to the execution and delivery of the lease to 1001 Madison Corporation and the Option Agreement to Infinity, Infinity, as sponsor, submitted to the Attorney General of the State of New York, a cooperative offering plan. The tenants formed a Tenants' Committee, retained independent counsel and opposed the terms of the cooperative offering plan because they believed that the sale of apartments would be subject to the April 5, 1984 Lease and Option Agreement. They believed that if there were a default under the Lease or if the optionee failed to purchase the land and building, then apartment purchasers might lose their rights to the apartments, that because fee title to the apartments was not being conveyed, the apartment purchasers would not receive tax deduction benefits for the payment of real estate taxes.

Fearing that the New York State Attorney General would reject the Cooperative Plan, the principals of Infinity and 1001 Madison Corporation requested a meeting with Schnurmacher in order to propose a restructuring of the transaction.

The proposal for restructuring involved converting the Property to condominium use. The condominium would be comprised of residential units ("Residential Units") and one commercial unit ("Commercial Units").

The parties then proceeded to negotiate, and the transactions were restructured so that:

1. Infinity would pay all of Schnurmacher's real estate taxes related to this Property.

2. Infinity would pay all of Schnurmacher's other expenses including fees for pro-

fessional services and any real estate brokerage commissions.

3. Infinity would pay the New York State Real Property Gains Tax if the option to purchase the Commercial Unit were exercised in the future at the purchase price of $26,000,000.

4. Infinity would pay an additional $2,000,000 for the option on the Commercial Unit.

5. The lease and option transaction at other buildings would be restructured as absolute sales.

The taxes and professional fees amounted to more than $6,000,000. Prior to the restructuring, Schnurmacher received $11,000,000 as option deposits. After the restructuring, Schnurmacher received $19,000,000 (sales proceeds) and $4,500,000 (option deposit) or a total of $23,500,000. Thus, as a result of the restructuring, Schnurmacher received an additional $12,500,000 not including the payment of their taxes and expenses.

In accordance with the transactions as restructured, Infinity submitted an Offering Plan to the Attorney General of the State of New York pursuant to New York State General Business Law § 352. Under § 352, Infinity, as sponsor, sought to convert the building to condominium use. The Offering Plan was accepted for filing on December 27, 1985 by the Attorney General of the State of New York.

On July 26, 1986, Schnurmacher executed a "Declaration establishing a plan for condominium ownership." On September 4, 1986, the Declaration of Condominium (the "Declaration") including condominium by-laws (the "By-laws") and floor plans with respect to the Property were filed with the City Register of the City of New York.[3] The Property,

---

der; that Optionor has not as of the date hereof received any notice from said tenants that Lessor is in default thereunder, and Lessor has no information which would lead it to believe that it is in default thereunder.

3. Page 1 of part 1 of the Plan under the headnote "Introduction" states:

The Owner of the property is Schnurmacher Bros., having its principal office at 1114 First Avenue, New York, New York.

The Sponsor is Infinity Corporation, having its principal office at 8 Haven Avenue, Port Washington, N.Y. 11050. The Sponsor is, through a

wholly owned subsidiary, 1001 Madison Corp., the net lessee of the Property. The Sponsor is a contract vendee and will acquire fee title to the Residential Units prior to or simultaneously with the First Closing.

*The Offer*

The Sponsor hereby offers 102 Residential Units and 9 Servant Units for sale under this Plan. The purchase prices and estimated Common Charges for each of these Units are listed below in Schedule A—"Offering Prices and Related Information." In addition, there

then owned by Schnurmacher, was thereby submitted according to the provisions of the New York State Condominium Act to create a condominium consisting of 102 residential units and 9 servant room/units which are collectively called the "Residential Units." A separate unit identified in the Declaration as the "Commercial Unit" consists of stores, offices, and the garage space which is the subject of this action.

Pursuant to the Declaration and by deed dated November 25, 1986, title to the Residential Units vested in the Sponsor, Infinity,[4] and these units were then offered for sale to the public by the Sponsor, Infinity.[5] (Greenberg Aff. ¶ 5) The offer to sell residential units in the Property was made by means of a Condominium Offering Plan, dated December 27, 1985 (the "Plan").

Pursuant to New York law, the Plan was required to contain a full and accurate description of all terms of the offering and was to be distributed to all potential purchasers of units. The Plan incorporated the Declaration and the By-laws and set forth the terms and conditions governing the sale and purchase for the Residential Units.

The Plan, including the Declaration, By-laws and other documents described therein, comprised an offer to sell to the public the Residential Units.

Schnurmacher retained ownership of the Commercial Unit. The Declaration and the Plan also provided that a deed to the Com-

mercial Unit, including the garage, would be issued to Schnurmacher. On November 25, 1986, Schnurmacher as optionor and Infinity as optionee modified the Option Agreement dated as of April 5, 1984 whereby Infinity obtained an option to purchase all of Schnurmacher's right, title and interest to that portion of the Property retained by Schnurmacher and designated in the Declaration as the Commercial Unit. The lease between 1001 Madison Corp. and Schnurmacher was modified by agreement dated April 25, 1986 making the lease subject to the Declaration of the Charles House Condominium and modifying the lease to be a lease of the Commercial Unit.

In late 1986, 1001 Madison Corp. merged into Infinity. Thus, in addition to its option to purchase right, title and interest in the Commercial Unit, Infinity succeeded to the rights of 1001 Madison Corp. as the tenant under the modified lease between Schnurmacher and 1001 Madison Corp.

On April 22, 1986, Irwin Schnurmacher and Adolph Schnurmacher appeared before and were examined under oath by the New York State Attorney General. The Attorney General found that the transaction between Schnurmacher and Infinity were arm's-length transactions.

After the Attorney General accepted the Offering Plan for filing, an Article 78 Proceeding was commenced in the Supreme Court of the State of New York by the

---

are certain closing costs which are listed in "Unit Closing Costs and Adjustments."

The stores, garage and offices at the property will constitute a separate condominium unit (the "Commercial Unit") retained by the Owner and not leased to a designee of the Sponsor and is not offered for sale under this Plan. The superintendent's apartment (apartment 1A) is not offered for sale but will be part of the common elements.

Page 2 part 1 of the Offering Plan under the heading "Basic Aspects of Condominium Ownership" states:

Each purchaser owns his Unit outright and is entitled to exclusive possession of his Unit (unless it is purchased subject to the rights of a non-purchasing tenant) together with an interest in and right to use the General Common Elements and Residential Limited Common Elements other than terraces and balconies as to which the Unit Owner whose Unit has direct

and exclusive access thereto has an exclusive right to use.

4. By Deed dated November 25, 1986, Schnurmacher conveyed title to the Residential Units to Infinity, which Deed was recorded in the office for the City Register of the City of New York on December 16, 1986.

5. As part of the overall structure of the transaction, the Option Agreement with Infinity and the net Lease with 1001 Madison Corp. were modified. A modification of the Option Agreement was executed by Schnurmacher and Infinity whereby Infinity was afforded an option to purchase the Commercial Unit from Schnurmacher. The net Lease between Schnurmacher and 1001 Madison Corp. was also modified by making the Lease subject to the Declaration which "shall hereafter be deemed a lease of the Commercial Unit."

Tenants' Committee, Stanley Deutsch, Charles Fabricant, Robert Cornell, Bernard Janoff, and Herbert Klapper against the Attorney General of the State of New York seeking a judgment to set aside and annul the determination of the Attorney General.

Subsequent to the commencement of the action in the State Court, the Attorney General, by letter dated June 25, 1986, rescinded his acceptance of the Offering Plan. Thereafter, Infinity intervened in the proceeding commenced by the Tenants' Committee and the residential tenants, seeking a judgment compelling the Attorney General to accept the Offering Plan for filing and directing the Attorney General to cancel and annul the letter of rescission of the Plan dated June 25, 1986.

The matter was presented to Justice Robert E. White of the New York Supreme Court for a determination.[6] The court concluded that there was no collusion or self-dealing between Schnurmacher and Infinity.[7]

A final judgment which, *inter alia*, dismissed the petition and directed the Attorney General to accept the Offering Plan for filing was entered in the office of the clerk of New York County on March 20, 1987. The petitioners served and filed a notice of appeal from the final judgment on April 21, 1987.

Subsequently, the Tenants' Committee and Infinity entered into an agreement resolving all outstanding issues, which agreement was memorialized in the Eighth Amendment to the Offering Plan, which was accepted for filing with the Attorney General of the State of New York on or about July 17, 1987.

The Eighth Amendment to the Offering Plan incorporates as Exhibit J thereof a letter agreement dated June 25, 1987 between the sponsor's attorney and the Tenants' Committee's attorney whereby the Tenants' Committee agreed to withdraw its objection to the Offering Plan, withdraw its appeal from the final judgment of the state supreme court, and recommend to the membership not to commence any further litigation.[8] As a result of the agreement culminating in the Eighth Amendment, the Tenants' Committee and the residential tenants withdrew the appeal of the final judgment entered in the state court litigation.

Stanley Deutsch, as owner of one of the Residential Units, and the president of the plaintiff, The Board of Managers of the Charles House Condominium, commenced a proceeding before the New York State Division of Housing and Community Renewal ("D.H.C.R.") seeking a determination that the garage portion of the Commercial Unit was subject to the New York State Rent Stabilization Law which would result in some of the parking spaces being subject to rent regulation. By Order dated April 22, 1987, the D.H.C.R. denied the application. Subsequently, Deutsch petitioned the Commissioner of the D.H.C.R. for an administrative review of the Order denying his application to determine that the garage was subject to rent stabilization. The petition for administrative review was dismissed by the Commissioner of the D.H.C.R.

By notice dated April 30, 1992, plaintiff served notice upon defendants (pursuant to the Condominium and Cooperative Conversion Protection and Abuse Relief Act (the "Act"), 15 U.S.C. § 3601 *et seq.*) terminating *inter alia,* (a) the Condominium Offering Plan; (b) the Declaration; (c) the By-laws; (d) the Option Agreement dated as of April 5, 1984; (e) the Lease between Schnurmacher Bros. and 1001 Madison Corp.; and (f) the Deed to the Commercial Unit of the Charles House Condominium.

Plaintiff filed for declaratory judgment in July 1992 adjudging that all rights, title and interest of the defendants in and to the park-

---

6. *In Matter of the Application of the Tenants Committee of 40 East 78 Street, et al. v. Abrams ("East 78 Street"),* No. 99306/86 (S.Ct.N.Y.Co. Feb. 11, 1987).

7. *East 78 Street,* at 3.

8. The Eighth Amendment states in pertinent part:

The terms of the amendment (except paragraphs 1, 3, 4 and 15) are a result of negotiations with the Tenants' Committee of 40 East 78th Street. The Tenants' Committee recommends that no further litigation be brought against the sponsor with respect to matters in the Offering Plan.

ing garage located on the Property have been validly and timely terminated under the Act. Defendants subsequently made certain counterclaims and moved for summary judgment.

## II. DISCUSSION

Plaintiff's complaint alleges that defendants attempted to enter into an illegal, self-dealing conversion agreement in violation of the Act. The Act was promulgated to abate specific abusive practices occurring in the cooperative and condominium conversion process. *See* H.R. Conf.Rep. No. 1420, 96th Cong., 2d Sess. 162, reported in 1980 U.S.Code Cong. & Admin.News 3506, at 3707.

"The primary purpose of the Act was to protect cooperative and condominium unit owners against overreaching by developers. Thus, the Act provided means for unit owners to challenge unconscionable leases and self-dealing contracts." *King v. 415 Second Owners Corp.*, No. 86 Civ. 4800, 1987 U.S. Dist.Lexis 15211 (S.D.N.Y. Nov. 12, 1987), *3.

"Section 3607 of the Act, in particular, was a response to the activities of many developers in the 1970's who created "sweetheart" lease arrangements and self-dealing contracts as a condition of sale." *Barnan Association v. 196 Owner's Corp.*, 797 F.Supp. 302, 304 (S.D.N.Y.1992).

The Act permits the unit owners or an association of unit owners to terminate, without penalty certain long-term self-dealing contracts. It provides in pertinent part:

(a) Any contract or portion thereof which is entered into after October 8, 1980, and which—

(1) provides for operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project;

(2) is between such unit owners or such association and the developer or an affiliate of the developer;

(3) was entered into while such association was controlled by the developer through special developer control or be-

cause the developer held a majority of the votes in such association; and

(4) is for a period of more than three years, including any automatic renewal provisions which are exercisable at the sole option of the developer or an affiliate of the developer, may be terminated without penalty by such unit owners or such association.

15 U.S.C. § 3607(a). All four elements must exist for a contract to be terminated under the statute. *West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 197 (2d Cir.), *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 107 (1987).

"The Abuse Relief Act seeks to eliminate the potential for abuse to which the conversion process lends itself. Congress undertook the delicate task of deterring these abuses without preventing conversions from taking place. Section 3607 of the Abuse Relief Act targeted a particular form of abuse to which tenants were vulnerable, namely, self-dealing leases arranged by sponsors. Sponsors have an economic incentive to take advantage of the temporary control they exert over tenants' corporations to bind tenants to long term, self-dealing leases— leases that potentially deprive the tenants of valuable assets." *181 E. 73rd St. Co. v. 181 E. 73rd Tenants Corp.*, 954 F.2d 45, 47 (2d Cir.1992) (citations omitted). *See also Park So. Tenants v. 200 Cent. Park So. Associates*, 748 F.Supp. 208, 211 (S.D.N.Y.1990), *aff'd*, 941 F.2d 112 (2d Cir.1991) (citations omitted).

Plaintiff claims that defendants realized that the initial cooperative agreement would not succeed and restructured the agreement to escape the application of the Act. Plaintiff points to the provision of the Declaration allocating only 11.8596% of the Common Elements to the Commercial Unit as evidence of self-dealing nature of the transaction. Plaintiff contends that that allocation is disproportionate because on a square footage basis, the Commercial Unit constitutes 26.84% of the building and on a value basis, the Commercial Unit constitutes 69.5% of the value. Nevertheless, the Commercial Unit only pays 11.8596% of the project's expenses.

Plaintiff attempted to terminate the Condominium Offering Plan, the Declaration, the By–Laws, the Option Agreement dated as of April 5, 1984, the Lease between Schnurmacher Bros. and 1001 Madison Corp., and the Deed to the Commercial Unit of the Charles House Condominium pursuant to § 3607 of the Act.

Defendants alleged certain counterclaims and moved for summary judgment that plaintiff's termination is invalid. Defendants claim that 1) plaintiff failed to join certain necessary and indispensable parties; 2) plaintiff is estopped from terminating defendants' agreement because plaintiff released defendants from further suit in a prior agreement; 3) plaintiff is collaterally estopped from raising its claims against defendants by a prior New York Supreme Court decision; 4) plaintiff's notice of termination was untimely; and 5) the Act does not apply to defendants because Schnurmacher is not a developer as defined by the Act and the garage is not property serving the condominium.

Defendants make counterclaims for declaratory judgment that the termination is invalid, that Schnurmacher owns the Commercial Unit in fee simple, and that defendants are entitled to the costs of the action.

Both plaintiff and defendants claim a right to attorneys' fees.

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment is appropriate if, "in light of the evidence presented, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Hurwitz v. Sher*, 982 F.2d 778, 780 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Summary judgment is appropriate when, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir.1989) (*quoting Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)). *See also Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512 (inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

In considering a motion for summary judgment the facts must be viewed in a light most favorable for the nonmoving party. *Hurwitz*, 982 F.2d at 780 (*citing United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962)).

"The moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *Hurwitz*, 982 F.2d at 780 (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact"). *See also Barnan*, 797 F.Supp. at 304. The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the materials] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *See also Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). *See also Barnan*, 797 F.Supp. at 304. It must establish that there is a "genuine issue for trial." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. *See also Barnan*, 797 F.Supp. at 304.

" 'In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party.' " *Barnan*, 797 F.Supp. at 304 (*quoting Knight*, 804 F.2d at 11). "[T]he judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2511. *See also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied sub nom. Thomas J. Lipton, Inc. v. R.C. Bigelow, Inc.*, 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989).

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will probably preclude the entry of summary judgment.... while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510.

B. Failure to Join Necessary and Indispensable Parties

██ Defendants argue that as a matter of law they are entitled to summary judgment because plaintiff has failed to join necessary and indispensable parties. As part of the restructured condominium agreement, Schnurmacher leased the Commercial Unit to 1001 Madison Corp. By virtue of the merger of 1001 Madison Corp. with Infinity in late 1986, Infinity is the tenant of the Commercial Unit. Infinity borrowed significant sums of money from Chemical Bank, Chase Manhattan Bank, N.A. and Marine Midland Bank, N.A. which amount was secured by mortgages on Infinity's leasehold interest in the Commercial Unit.[9]

Defendants claim that pursuant to Federal Rules of Civil Procedure, Rule 19(a), the banks are indispensable parties and that plaintiff's failure to join them in the suit is grounds for summary judgment.

The Federal Rules establish a two pronged test for the joinder of indispensable parties. The first prong, Rule 19(a), states:

**Persons to be Joined if Feasible.** A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do

---

**9.** Chemical Bank is the holder of a mortgage on the leasehold interest. The mortgage secures an indebtedness of $13,300,124 as set forth in a consolidation and modification agreement dated June 27, 1991. It was recorded in the office of the City Register of the City of New York on October 31, 1991.

On June 27, 1991, Infinity delivered to the Chase Manhattan Bank a "Note and Mortgage Consolidation and Modification Agreement" securing an indebtedness in the amount of $1,330,965.57. The mortgage was recorded in the office of the City Register of the City of New York on October 31, 1991.

Marine Midland Bank, N.A. is a holder of a leasehold mortgage securing an indebtedness of $3,226,760.97, dated May 28, 1992. The mortgage was recorded in the office of the City Register of the City of New York.

so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

If a party is indispensable according to the terms in Rule 19(a), but joinder is impractical, then the second prong of the test, Rule 19(b), provides:

> **Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Unless the conditions of Rule 19(a) are satisfied, the court need not consider dismissal under Rule 19(b). *Associated Dry Goods Corp. v. Towers Financial Corp.*, 920 F.2d 1121, 1123 (2d Cir.1990). The determination of whether or not a party is indispensable shall be based on the pleadings. *Towers*, 920 F.2d at 1124 (quoting C. WRIGHT & A. MILLER, 7 FEDERAL PRACTICE & PROCEDURE § 1604, at 40 (1986)) (court considering "whether [an] absent person's interest in the litigation is sufficient to satisfy ... the first sentence of Rule 19(a) ... must base its decision on the pleadings as they appear at the time of the proposed joinder") (ellipsis in original). Thus, whether a party is indispensable and whether a "lawsuit must be dismissed in the absence of that [party], can only be determined in the context of a particular litigation." *Curley v. Brignoli, Curley & Roberts Assoc.*, 915 F.2d 81, 90 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1430, 113 L.Ed.2d 484 (1991) (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118, 88 S.Ct. 733, 742, 19 L.Ed.2d 936 (1968)).

In this action, in which plaintiff seeks to divest Schnurmacher of title to the Commercial Unit and terminate Infinity's Lease of the Commercial Unit, the banks which hold an interest in the Lease between Schnurmacher and Infinity are indispensable parties. Complete relief could not be awarded plaintiff by virtue of a declaratory judgment against Schnurmacher and Infinity because title and rights to the property would be subject, to some extent, to the rights of the banks in the Property. Therefore, the banks are indispensable.

The indispensable nature of the banks in this case does not, however, call for summary judgment of the case as defendants assert. Rule 19(a) states plainly that if an indispensable party "has not been so joined, the court shall order that the person be made a party." Dismissal under Rule 19(b) is called for only when joinder is not feasible. Defendants have made no claim that joinder is not feasible. Therefore, failure to join an indispensable party in this case is not grounds for summary judgment or dismissal.

### C. Estoppel by Release

■ Defendants claim that, as a matter of law, plaintiff is estopped from claiming any relief pursuant to an agreement between the Tenants' Committee and Infinity. Stanley Deutsch and the Tenants' Committee withdrew their appeal of the New York Supreme Court judgment subsequent to negotiations with Infinity. The negotiations resulted in the adoption of the Eighth Amendment to the Offering Plan which states:

> The terms of this amendment, (except paragraphs 1, 3, 4, and 15) are a result of negotiations with the tenants' committee of 40 East 78th Street. The tenants' committee recommends that no further litigation be brought against the sponsor with respect to matters in the offering plan.

This amendment and its concurrent resolution of the state court litigation, however, are

insufficient to constitute a release estopping plaintiff in this action from claiming relief.

The Eighth Amendment states only that plaintiff's predecessors in interest "recommend[ ]" that no further litigation be brought. It does not preclude plaintiff's predecessors in interest from pursuing further litigation and it certainly does not preclude plaintiff from suit. Therefore, defendants' argument that plaintiff is estopped from suing pursuant to an agreement between defendant Infinity Corp. and plaintiff's predecessors in interest is unpersuasive as a basis for summary judgment.

D. Collateral Estoppel: *In Matter of the application of the tenants committee of 40 East 78 Street, et al. v. Abrams*

■ Defendants further claim that plaintiff, as a matter of law, is collaterally estopped from raising its claims against defendants by a prior New York Supreme Court decision. *In Matter of the Application of the Tenants Committee of 40 East 78 Street, et al. v. Abrams,* No. 99306/86 (S.Ct.N.Y.Co. Feb. 11, 1987).

In previous state court proceedings, the Tenants' Committee, Stanley Deutsch and others sought a judgment, pursuant to state law,[10] declaring the Offering Plan null and void upon the grounds, *inter alia,* that Infinity failed to fully disclose its relationship with Schnurmacher in the transaction. New York law requires that transactions be arm's-length and fully disclosed.[11]

The Attorney General found that the transactions between the defendants were arm's-length and that the disclosure made in the conversion documents was adequate. The Attorney General's determination was reviewed by the Supreme Court of the County of New York in a proceeding entitled "In the Matter of the application of the Tenants Committee of 40 East 78 Street, Stanley Deutsch, Charles Fabricant, Robert Cornell, Bernard Jancoff and Herbert Klapper, petitioners against Robert Abrams, Attorney General of the State of New York, respondent and Infinity Corp. respondent-intervenor." (Index No. 99306/86, Feb. 11, 1987) Justice White adjudicated the only issue from which Justice Evans recused himself: whether the sponsor, Respondent–Intervenor Infinity Corp.

... materially and fraudulently misrepresented in the Plan that Infinity is the sole Sponsor and failed to disclose the interests of Schnurmacher Brothers in the Offering,

---

10. Cooperative and condominium conversions in New York are regulated by General Business Law, Art. 23–A § 352 et seq. Section 352–e states:

1. (a) It shall be illegal and prohibited for any person, partnership, corporation, company, trust or association, or any agent or employee thereof, to make or take part in a public offering or sale in or from the state of New York of securities constituted of participation interests or investments in real estate, mortgages or leases ... as defined in section three hundred fifty-two of this article, when such securities consist primarily of participation interests or investments in one or more real estate ventures, including cooperative interests in realty, unless and until there shall have been filed with the department of law, prior to such offering, a written statement or statements, to be known as an "offering statement" or "prospectus" concerning the contemplated offering which shall contain the information and representations required by paragraph (b)....

(b) The detailed terms of the transaction; a description of the property, the nature of the interest, and how title thereto is to be held; the gross and net income for a reasonable period preceding the offering where applicable and available; the current gross and net income where applicable and available; the basis, rate and method of computing depreciation; and description of major current leases; the essential terms of all mortgages; the names, addresses and business background of the principals involved, the nature of their fiduciary relationship and their financial relationship, past present and future, to the property offered to the syndicate and to those who are to participate in its management; the interests and profits of the promoters, offerors, syndicate organizers, officers, directors, trustees or general partners, direct and indirect, in the promotion and management of the venture....

11. In the commentary to § 352–e, the author states that "New York can be described as a 'full disclosure state' rather than a 'merit standard' state; that is, so long as full disclosure is provided by the prospectus to potential investors, the Martin Act is complied with." David Kaufmann, *Practice Commentary,* MCKINNEY'S CONSOLIDATED LAWS OF NEW YORK, v. 19 at 30.

despite the evidence that was before the Attorney General's Office.[12]

The New York court stated that the Property had been "sold to Infinity Corp., which entered into a complex sale relationship with the Schnurmacher family reflecting the latter's interest in a tax advantaged transaction."[13]

Justice White stated the contentions of the parties as follows: 1) Plaintiffs contended that "the Schnurmachers [were] actually co-sponsors of the Plan, and that the failure to disclose their identity as such is violative of Infinity Corp.'s responsibility to make full disclosure;" and 2) Infinity Corp. contended that "it [was] the sole sponsor of the Plan; that it purchased the property on the open market from the Schnurmacher interests in an arm's-length transaction; and that Infinity Corp. has made the required disclosure of the various interests involved."[14]

After noting that the Attorney General had come to the conclusion that the transaction between the Schnurmachers and Infinity was at arm's-length and that the disclosure was adequate, the court concluded:

> There is nothing in the documents before this Court that would warrant setting aside the acceptance of the Plan for filing based upon any relationship between the Schnurmachers and Infinity. The Petitioners rely largely upon the ease with which the agreement between the Schnurmachers was renegotiated when the initial filing encountered problems. However, this is hardly sufficient to demonstrate the existence of any conspiracy or that the Schnurmacher family is actually a co-principal in the offering to the tenants. Petitioners have tacitly conceded that they have no direct evidence of any conspiracy between Infinity and the Schnurmachers (See Petitioner's Memorandum of Law, p. 13). Petitioners indicate dissatisfaction with the questioning of the Schnurmachers at the hearing conducted by the Attorney

General. However, they offer nothing but speculation to contradict the sworn testimony adduced. In sum, it cannot be said on the record before this Court that there was inadequate disclosure of the Schnurmachers' position. Nor has any proof been adduced which would indicate that the Schnurmachers do have a duty or other interest in Infinity Corp. Accordingly, the application is denied and the Petition is dismissed ... [15]

In this action, plaintiff seeks declaratory judgment of the validity of its termination of the Condominium Offering Plan, the Declaration, the By-laws, the Option Agreement dated as of April 5, 1984, the Lease between Schnurmacher and 1001 Madison Corp., and the Deed to the Commercial Unit of the Charles House Condominium pursuant to 15 U.S.C. § 3601 *et seq.*

Defendants claim that the state court decision that the transaction between Infinity and Schnurmacher was at arm's length serves as collateral estoppel in plaintiff's present action under the Act.

The United States Supreme Court has defined the parameters of the doctrine of collateral estoppel on several occasions. In *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1970), the Court noted that

> Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.

*Parklane Hosiery*, 439 U.S. at 326, 99 S.Ct. at 649 (*citing Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971)).[16]

---

12. *East 78 Street*, at 2.

13. *East 78 Street*, at 2.

14. *East 78 Street*, at 2.

15. *East 78 Street*, at 3.

16. The purpose of the doctrine of collateral estoppel is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *United States v. Mendoza*, 464 U.S. 154, 158, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984) (*quoting*

The doctrine of collateral estoppel applies both to questions of law and fact. *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 170–71, 104 S.Ct. 575, 578, 78 L.Ed.2d 388 (1984) ("collateral estoppel can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action") (citation omitted).

■ The doctrine of collateral estoppel creates preclusion of issues decided in state court, as well as those decided in federal court, as determined by the law of the state.[17] In *Migra v. Warren City School District BD of Ed.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), the Supreme Court held that

> It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.

*Migra*, 465 U.S. at 81, 104 S.Ct. at 896. Quoting its decision in *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), the Court held that " . . . Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the court of the State from which the judgments emerged would do so . . ." *Migra*, 465 U.S. at 81, 104 S.Ct. at 896. This requirement is codified by federal statute 28 U.S.C. § 1738.[18] *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982) ("Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged").

■ Under New York law, collateral estoppel prevents relitigation of an issue which is identical to one necessarily decided in prior action and which parties were afforded full and fair opportunity to contest in that proceeding. *Polur v. Raffe*, 912 F.2d 52 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 1389, 113 L.Ed.2d 446 (1991); *Temple of Lost Sheep Inc. v. Abrams*, 930 F.2d 178 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991); *U.S. v. U.S. Currency in the Amount of $228,536.00*, 895 F.2d 908 (2d Cir.), *cert. denied*, 495 U.S. 958, 110 S.Ct. 2564, 109 L.Ed.2d 747 (1990).

The central issue of the previous state court litigation decided by Justice White is the identical issue that is central to this litigation. In the opening sentence of "Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment," plaintiff presents the question currently before the court in the following manner:

> Defendants Infinity Corporation ("Infinity") and Schnurmacher Bros. ("Schnurmacher") seek by this summary judgment motion to reverse the Charles House apartment owners' termination under the *Condominium and Cooperative Protection and Abuse Relief Act of 1980* (the "Act"), 15 U.S.C. 3601 et seq., of an unfair and oppressive "sweetheart" lease relating to the Charles House garage. The operative facts which compel denial of defendants' motion are set forth in the accompanying

*Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980)).

**17.** Preclusive effect is also given to state administrative proceedings. The Court in *University of Tennessee v. Elliott*, 478 U.S. 788, 797, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986) held that

> it is sound policy to apply principles of issue preclusion to the fact-finding of administrative bodies acting in a judicial capacity. In a unanimous decision in *United States v. Utah Construction & Mining Co.*, 384 U.S. 394 [86 S.Ct. 1545, 16 L.Ed.2d 642] (1966), we held that. . . . 'When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties

> have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.'

*Elliott*, 478 U.S. at 797–98, 106 S.Ct. at 3225–26 (citation omitted). While defendants in this case appeared and presented evidence regarding the Condominium conversion to the New York Attorney General and while plaintiff commenced proceedings before the New York State Division of Housing and Community Renewal regarding rent stabilization of the garage, it is not necessary to reach the issue of the preclusive nature of those proceeding to resolve the case at hand.

**18.** *See also Kremer*, 456 U.S. at 466, n. 6, 102 S.Ct. at 1889, n. 6 (discussing the history of the codification of 28 U.S.C. § 1738).

affidavit of plaintiff's President, Stanley I. Deutsch (the "Deutsch Affidavit").

The central issue here, then, is the existence of an unfair and oppressive "sweetheart" lease. The central issue in the state court proceedings was whether defendants

> ... materially and fraudulently misrepresented in the Plan that Infinity is the sole Sponsor and failed to disclose the interests of Schnurmacher Brothers in the Offering.[19]

In other words, the issue in state court was whether there was some undisclosed collusion between Infinity and Schnurmacher, colloquially, a "sweetheart" transaction. This issue was fully litigated in state court by the Tenants' Committee who are in privity with plaintiff Charles House and who were lead by Stanley Deutsch on both occasions.

Plaintiff argues that it is not collaterally estopped because the state court action brought by the Tenants' Committee concerned state law while the current action brought by Charles House Condominium concerns federal law. While plaintiff's may be correct in asserting that this case involves a different claim, plaintiff cannot succeed in arguing that a different issue is involved here. In other words, even though plaintiff here has brought a separate cause of action—one under federal law—the question is whether the central issue here is the same as that litigated in state court. "Under the judicially developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *Mendoza,* 464 U.S. at 158, 104 S.Ct. at 571 (*quoting Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)).[20]

Throughout its argument, plaintiff repeatedly states that Schnurmacher and Infinity engaged in a "sweetheart" deal.[21] In fact, this is the basis for plaintiff's complaint. Without plaintiff's accusation that defendants engaged in a "sweetheart" lease there would be no transaction on which plaintiff could make its claims; plaintiff has presented no other transaction as a basis for its termination. However, this issue was decided against plaintiff in state court. Plaintiff is collaterally estopped from raising the issue again in federal court. Defendants' motion for summary judgment is, therefore, granted.

## IV. APPLICABILITY OF ACT TO DEFENDANTS

While the doctrine of collateral estoppel, which precludes plaintiff's claims of self-dealing by the defendants, provides an independent and sufficient basis for granting defendants' motion for summary judgment, defendants' motion for summary judgment also succeeds because the Act is not applicable to the instruments that plaintiff terminated.

Plaintiff seeks declaratory judgment supporting its termination under the Act of 1) the Condominium Offering Plan 2) the Declaration 3) the By-laws 4) the Option Agreement 5) the Lease between Schnurmacher and 1001 Madison Corp. and 6) the Deed for the Commercial Unit.

The Act provides for termination of any contract or portion of a contract which "is between such unit owners or such association and the developer or an affiliate of the developer...."[22]

### A. Agreements Between Owners and Developers

▉▉▉ The Option Agreement is between Schnurmacher, as the developer, and Infini-

**19.** *East 78 Street,* at 2.

**20.** The Court in *Parklane Hosiery* discussed the difference between res judicata and collateral estoppel:

> Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

*Parklane Hosiery,* 439 U.S. at 326, n. 5, 99 S.Ct. at 649, n. 5 (citations omitted).

**21.** *See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment,* at 1–6, 22, 25, 26, 28.

**22.** 15 U.S.C. § 3607.

ty, a third party. It is not between a unit owner or association and a developer or affiliate. The Act was not intended to apply to contracts which involved third parties and did not involve the tenants themselves so as to be self-dealing. In *69th Street & 2nd Ave. Garage Associates, L.P. v. 301/69 Owners Corp.*, 91 Civ. 7966, 1992 WL 47989, 1992 U.S. Dist.Lexis 2239, (S.D.N.Y. Feb. 28, 1992), the district court considered a third party that

> was involved in an arm's-length transaction in which it paid $1,000,000 to purchase the garage. Terminating a sale to an innocent third party [ ... ] would thus conflict with the equitable principles underlying the statute. Indeed, the plain language of the Act only contemplates terminating contracts between the sponsor and the cooperative or condominium.

*69th Street*, 1992 WL 47989, *3, 1992 U.S. Dist Lexis 2239, *7–8. The Option Agreement is, therefore, not subject to termination under the Act.

■ The Lease between Schnurmacher and 1001 Madison Corp. is also not a contract [23] between the tenants and the developer. Therefore, the lease is not subject to termination under the Act. *Accord 2 Tudor City Place Associates and 2 Tudor Garden Parking Corp. v. 2 Tudor City Tenants Corp.* No. 87 Civ. 5850, 1990 WL 63809, *3, 1990

U.S. Dist.Lexis 5572, *10 (S.D.N.Y. May 9, 1990) (where garage lease was between future developer of cooperative and affiliate corporation, lease could not be terminated because it was not between "unit owners or such [cooperative] association and the developer or an affiliate of the developer") (parenthetical in original).

■ The Deed to the Commercial Unit involves only Schnurmacher's fee simple interest in property that it built and never conveyed. The Deed, therefore, certainly does not involve a contract between the developer and the tenants which is terminable under the Act, especially "given that the two remedial provisions of the statute, §§ 3607 and 3608, do not address a contract that is an outright reservation of fee simple title in the property being converted to cooperative or condominium." *69th Street*, 1992 WL 47989, *2, 1992 U.S. Dist.Lexis 2239, *3–4.

Therefore plaintiff's termination of the Option Agreement, the Lease, and the Deed are invalid because § 3607 of the Act is inapplicable to such third party instruments.

### B. Who's a "Developer"

■ Defendants claim that the Act does not apply to them because Schnurmacher is not a "developer" [24] or "affiliate of the developer" [25] as defined by the Act.

---

**23.** *Compare West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 192 (2d Cir.), *cert. denied*, 484 U.S. 871, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) (*discussing why a lease is a "contract" within meaning of the Act*).

**24.** Section 3603 of the Act defines "developer" as:

> (A) any person who offers to sell or sells his interest in a cooperative or condominium unit not previously conveyed, or (B) any successor of such person who offers to sell or sells his interest in units in a cooperative or condominium project and who has the authority to exercise special developer control in the project including the right to: add, convert, or withdraw real estate from the cooperative or condominium project, and maintain sales offices, management offices and rental units; exercise easements through common elements for the purpose of making improvements within the cooperative or condominium; or exercise control of the owners' association

**25.** Section 3603 defines "affiliate of a developer" as:

> any person who controls, is controlled by, or is under common control with a developer. A person "controls" a developer if the person (A) is a general partner, officer, director, or employer of the developer, (B) directly or indirectly or acting in concert with one or more other persons, or through one or more subsidiaries, owns, controls, holds with power to vote, or holds proxies representing, more than 20 per centum of the voting interest of the developer, (C) controls in any manner the election of a majority of the directors of the developer, or (D) has contributed more than 20 per centum of the capital of the developer. A person "is controlled by" a developer if the developer (i) is a general partner, officer, director employer of the person, (ii) directly or indirectly or acting in concert with one or more other persons, or through one or more subsidiaries, owns, controls, holds with power to vote, or holds proxies representing, more than 20 per centum of the voting interest of the person, (iii) controls in any manner the election of a majority of the directors, or (iv) has

Under the Act, a developer must sell or offer to sell property. Section 3603 of the Act defines "sale" as "any obligation or arrangement for consideration for conveyance to a purchaser of a cooperative or condominium unit, excluding options or reservations not binding on the purchaser." In the restructured transaction which is the subject of this litigation, Schnurmacher conveyed title to the Residential Units to Infinity and sold Infinity an option to purchase the Commercial Unit in addition to its lease of the Commercial Unit to Infinity.

Defendants argue that since option agreements are not sales or offers to sell under the Act [26] and since they did not sell or offer to sell the Commercial Unit which includes the garage that is the subject of this litigation, they are not developers. However, as part of the condominium conversion, defendant Schnurmacher sold its interest in the Residential Units to Infinity.[27] Infinity then offered the residential units for sale to the public. Therefore, Schnurmacher is a developer under the Act.

### C. Serving the Condominium Unit

■ Defendants also claim that the Act is inapplicable because the garage does not "serve" the condominium. Section 3607 of the Act permits termination of contracts which provide for the "operation, maintenance, or management of a condominium or cooperative association in a conversion project, or of property serving the condominium or cooperative unit owners in such project." "Serving the condominium . . . unit owners" is not defined by the Act.

In support of their position that the garage does not serve the condominium, defendants refer to language in the Offering Plan that permits the garage to be used for other purposes. Defendants also point out that since the construction of the building, the garage space has been used by the public. At no time did any residential tenants obtain

parking privileges in the garage space as consideration for the execution of a residential lease for the possession of a residential apartment unit. Tenants were permitted to park in the garage only by executing separate lease/agreements with the lessee of the garage space or agreeing to pay the lessee of the garage its daily, weekly or monthly parking rates.

In *5 West 14th Owners,* 815 F.2d at 198–99, the Second Circuit in considering on-site parking which was open to the public but contained preferences for unit owners, held that "[a] parking garage, with or without tenant preferences, provides a service that tenants might reasonably expect as an essential adjunct of their apartment complex." *See also 181 E. 73rd St. Co. v. 181 E. 73rd Tenants Corp.,* 954 F.2d 45, 48 (2d Cir.1992); *Cromwell Associates v. Oliver Cromwell Owners, Inc.,* 705 F.Supp. 116, 117 (S.D.N.Y. 1988), *aff'd,* 941 F.2d 107 (2d Cir.1991) (parking garages serves project); *Brabert Realty Co. v. 20125 Owners Corp.,* 703 F.Supp. 314 (S.D.N.Y.1989).

Moreover, plaintiff's documentary evidence that the garage serves the Condominium is persuasive. The Certificate of Occupancy for the Property states that "[p]arking is primarily for resident and tenants." (Deutsch Aff., Exh. A at 3). Additionally, the Board of Standards & Appeals, under Calendar # 752–64–B7, granted a variance in the Zoning Resolution to permit transient parking "on the condition that the tenants of this apartment house may recapture any of the space devoted to transient parking on 30 days notice . . ." (Deutsch Aff., Exh. B at 2)

The location of the garage, the certificate of occupancy, the Board of Standards & Appeals variance, in addition to the law of this Circuit, indicate that the garage serves the condominium unit owners. Therefore, the garages serves the condominium unit owners as required by the Act.

> gation or arrangement for consideration for conveyance to a purchaser of a cooperative or condominium unit, excluding options or reservations not binding on the purchaser;

---

contributed more than 20 per centum of the capital of the person;

**26.** 15 U.S.C. § 3603 provides:

(21) "sale", "sale of a cooperative unit" or "sale of a condominium unit" means any obli-

**27.** *See supra* n. 4.

## V. UNTIMELY

 Plaintiff served notice of termination on April 30, 1992. Plaintiff's termination was, therefore, effective July 29, 1992.[28] Defendants claim that they are entitled to summary judgment because plaintiff's termination was untimely.[29]

Section 3607(b) of the Act, entitled "Time of termination," states:

Any termination under this section may occur only during the two year period beginning on the date on which—

(1) special developer control over the association is terminated; or

(2) the developer owns 25 per centum or less of the units in the conversion project,

whichever occurs first.

The Act defines special developer control as:

any right arising under State law, cooperative or condominium instruments, the association's bylaws, charter or articles of association or incorporation, or power of attorney or similar agreement, through which the developer may control or direct the unit owners' association or its executive board. A developer's right to exercise the voting share allocated to any condominium or cooperative unit which he owns is not deemed a right of special developer control if the voting share allocated to that condominium or cooperative unit is the same voting share as would be allocated to the same condominium or cooperative unit were that unit owned by any other unit owner at that time.

15 U.S.C. § 3603(22).

 Special developer control is essentially developer domination of the board of directors. *West 14th Street,* 815 F.2d at 200. *See also 2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.,* 924 F.2d 1247, 1253 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991) ("Special developer control did not terminate until Tenants elected an independent board of directors.")

Defendant Infinity argues that plaintiff's termination is untimely because "special developer control" as provided by the Act ended more than two years prior to plaintiff's termination. Infinity presents two reasons for this assertion.

First, Infinity argues that "special developer control," under the terms of the Offering Plan,[30] is the *right* to appoint a majority to the condominium board. Defendant Infinity argues that it lost the right to appoint a majority to the condominium board by September 7, 1988 when it sold residential units

---

**28.** Section 3607(d) of the Act provides:

Following the unit owners' vote, the termination shall be effective ninety days after hand delivering notice or mailing notice by prepaid United States mail to the parties to the contract.

In order to fall within the statute of limitations for the Act, then, actual termination, which occurs ninety days after notice is given, must be effected within the two year period. *See 2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.,* 924 F.2d 1247, 1253 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 83, 116 L.Ed.2d 56 (1991).

**29.** In *Elan Corporation v. Reade Street Tenants Corp.,* slip op., No. Civ. 3131, 1986 WL 13776 (S.D.N.Y. Dec. 4, 1986), the court considered the implications of the requirement, under New York law, of disclosure in the offering plan of purchasers' rights under the Act in order to avoid violation of the Martin Act. The court determined that failure to disclose rights under the Act in the offering plan did not toll the statute of limitations under the Act, though it might be grounds for rescission of the contract in which purchasers purchased shares in the cooperative.

According to this interpretation, therefore, defendants' failure, here, to disclose plaintiff's rights under the Act in the Offering Plan did not toll the statute of limitations.

**30.** The Offering Plan states:

The affairs of the Condominium shall be governed by the Condominium Board, which shall consist initially of three members designated by Owner. At the first meeting of the Unit Owners, which will be held not later than seven months after the First Closing, the three-member Condominium Board shall resign in favor of a new seven-member Condominium Board, to be elected by Unit Owners at such meeting. Thereafter, elections to the Condominium Board shall be held at the regular annual meeting of Unit Owners held in October of each succeeding year. Special meetings of Unit Owners may be called by resolution of the Condominium Board or on petition of Unit Owners having in the aggregate not less than 25% of the Common Interest of all Unit Owners.

having more than 50 percent of the aggregate common interest appertaining to all residential units. Therefore, Infinity claims that the notice of termination should have been served by no later than September 7, 1990.

However, "special developer control" as defined in the Act is determined by actual control rather than by the right to control as defendants argue. In *2 Tudor City Tenants Corp.*, 924 F.2d at 1253, the Second Circuit noted that "special developer control did not terminate until Tenants elected an independent board of directors."

Infinity, as late as the filing of the Fifteenth Amendment to the Offering Plan filed with the Attorney General of the State of New York on January 28, 1991, claimed that it had the right to appoint the majority of the members of the Board through December 9, 1992 and, in fact, did appoint the majority of the boardmembers at least through January, 1991. It was not until January 1991 that a majority of the Board actually became controlled by the non-sponsor unit owners.[31]

Despite Infinity's claim that it lost the right to control the Board more than two years before plaintiff's termination, Infinity retained actual control, effecting "special developer control," so as to make plaintiff's termination timely.

The second argument which Infinity presents in support of its claim that "special developer control" ended more than two years prior to plaintiff's termination is that the "Initial Control Period," as defined on page 3 of the Offering Plan, ended on September 7, 1988. Therefore, Infinity argues, "special developer control" also ended on that date.

Plaintiff claims that apart from actual control or the terms of the "Initial Control Period" as provided in the Offering Plan, Infinity's "special developer control" within the meaning of the Act continued until at least December 10, 1990, because section 2.5 of the By-laws gave Infinity wide ranging powers, including veto powers over business decisions until that date.[32] Therefore, plaintiff claims

31. Infinity claims that even though it did appoint four boardmembers, only three were qualified pursuant to § 2.9(B) of the By-laws. Section 2.9(B) states:

> In addition, any member of the Condominium Board who shall cease to be qualified for membership pursuant to the terms of Section 2.7 hereof shall be deemed to have resigned [his or her] membership effective as of the date upon which such qualification shall cease.

Infinity claims that since only three of its appointees were qualified according to § 2.9(B), it did not appoint a majority of the seven member Board and therefore did not retain "special developer control."

Infinity's argument is unpersuasive. The last sentence of § 2.9(B) of the By-laws relating to a deemed resignation of a member of the Board only applies to a member of the Condominium Board "who shall cease to be qualified for membership pursuant to the terms of Section 2.7 hereof." Section 2.7 of the By-laws provides as follows:

> Except for members designated or elected by Declarant or its designees pursuant to the terms of this Section 2.7 or by Sponsor and the Commercial Unit Owner pursuant to the terms of Section 2.10 or Section 4.9 hereof, all members of the Condominium Board shall be either (i) individual Unit Owners; (ii) individual Permitted Mortgagees; (iii) officers, directors, shareholders, partners, principals, employees, or beneficiaries of corporations, partnerships,

fiduciaries or any other entities that are Unit Owners or Permitted Mortgagees; or (iv) adult Family Members of any of the foregoing.

Section 2.7 does not apply to boardmembers designated by the Sponsor or Commercial Unit Owner. By its own terms, Section 2.7 only relates to the qualifications of members of the Condominium Board, other than the Declarant, Sponsor and Commercial Unit Owner. Therefore, since boardmembers designated by Infinity did not have to qualify pursuant to § 2.7, Infinity controlled three rather than four—that is, a majority of the members of the board through January 1991.

32. Section 2.5 of the By-laws of the Condominium, entitled "Certain Limitations On The Powers of the Condominium Board," states:

> (A) Notwithstanding anything to the contrary contained in these By-Laws, for a period of three years from the First Closing, so long as Sponsor or its designee or both shall continue to collectively own Units representing 25% or more in aggregate Common Interest, the Condominium Board may not, without Sponsor's or such designee's prior written consent:
>
> (i) make any addition, alteration or improvement to the Common Elements or to any Unit, unless the same shall be required by Law or any insurance company insuring the Property:
>
> (ii) assess any Common Charges or Special Assessments for the creation or the replacement of, or the addition to, all or any part of a

that termination would have been timely through December 9, 1992.

In *Coliseum Park Apartments Co. v. Coliseum Tenants Corp.*, 742 F.Supp. 128 (S.D.N.Y.1990), the court held that certain retention of power by the Sponsor constitutes "special developer control." In *Park South Tenants Corp. v. 200 Central Park South Assocs.*, 748 F.Supp. 208, 213 (S.D.N.Y.1990), *aff'd*, 941 F.2d 112 (2d Cir. 1991), the District Court was persuaded that the "veto power accorded defendant Sponsor ... over such items as capital improvements, employee hiring, repairs, refinancing, augmentation of the reserve fund, provision of services, equipment procurement, and building leases falls within the Act's definition of 'special developer control' ...". *See, e.g., Barnan*, 797 F.Supp. at 308 (special developer control relinquished on the date shareholders elected a majority of directors not affiliated with Sponsor).

Plaintiff's replies as to Infinity are persuasive. Actual control rather than the right to control is determinative of "special developer control." Moreover, despite the provision for the "Initial Control Period" in the Offering Plan, the By-laws indicate that Infinity's right to control extended until December 1990, making plaintiff's notice of termination timely. In either case, with regard to Infinity, plaintiff's termination was timely.

■■■■ On the other hand, termination as to Schnurmacher was not timely. Schnurmacher, as determined above, is the developer in this case. Therefore any termination must have occurred during the two year period beginning on the date on which Schnurmacher owned 25% or less of the units in Property—that is, during the two year period beginning on November 25, 1986, the date Schnurmacher conveyed the Residential Units to Infinity. In other words, not later than November 25, 1988.

The termination notice in this case was effective on July 29, 1992, more than two (2) years after Schnurmacher owned less than twenty-five (25%) per cent of the units. Pursuant to § 3607(b) cited above, even if the Act could be applied to all of the instruments claimed by plaintiff, the termination of the instruments was not timely and is ineffective.

Even if Infinity was deemed to have continued to exercise "special developer control" over the association, termination as to Schnurmacher was required within two (2) years of November 26, 1986 when Schnurmacher owned less that twenty-five (25%) per cent of the units. Therefore, even if, under the Act, plaintiff could properly terminate a contract between the developer and Infinity as third party, its termination of the instruments since they involve Schnurmacher is invalid.

Plaintiff's argument that Schnurmacher and Infinity are partners and that Infinity's continued "special developer control" is attributable to Schnurmacher for the purpose of determining the statute of limitations case is unpersuasive. As determined above, plaintiff is collaterally estopped from arguing that defendants are partners or collusively acted. Therefore, termination which was valid as to Infinity was not necessarily valid as to Schnurmacher.

While plaintiff's termination was timely as to Infinity, it was not timely as to Schnurmacher. Therefore, plaintiff's statute of limitations bar provides an additional basis for granting defendants' motion for summary judgment.

## VI. DEFENDANTS' COUNTERCLAIM

Defendants make counterclaims for judgment 1) declaring the plaintiff's purported notice of termination to be null and void and of no force and effect; 2) declaring that Schnurmacher is the owner in fee simple absolute of the "Commercial Unit" free and

reserve, contingency or surplus fund in excess of five percent in the aggregate of the estimated Common Expenses for any year of operation;

(iii) increase the number or change the type of employees from that described in Schedule B set forth in the Plan;

(iv) enter into any service or maintenance contract for work not covered in the schedule referred to in subparagraph (iii) hereinabove; or

(v) borrow money on behalf of the Condominium.

(Schnurmacher Aff., Exh. G at H–4)

clear of the claims of the plaintiff and its successors in interest; and 3) awarding the costs of the action.

. For the reasons discussed herein, defendants' counterclaims are granted.

## VII. ATTORNEYS' FEES

Both sides claim a right to attorneys' fees. The Act permits prevailing plaintiffs to recover attorneys' fees at the discretion of the court and prevailing defendants to recover attorneys' fees where there is evidence of bad faith. *See King v. 415 Second Owners Corp.*, No. 86 Civ. 4800, 1987 U.S.Dist.Lexis 15211 (S.D.N.Y. Nov. 12, 1987), *2–3 ("The statute thus appears to create an asymmetry between plaintiffs, who are always entitled to a discretionary award of fees, and defendants, who are so entitled only if the action was 'frivolous, malicious, or lacking in substantial merit' ").

In the case at hand, plaintiff's case was not frivolous or malicious or so lacking in substantial merit as to warrant awarding defendants' attorneys' fees. Therefore, each party shall bear its own attorneys' fees.

## VIII. CONCLUSION

Defendants have established that there are no disputed issues of material fact. Defendants are entitled to summary judgment as a matter of law.

Plaintiff is estopped from raising its central claim by a prior state court determination. The Act is inapplicable to the Option Agreement, Lease, and Deed because these instruments did not meet the Act's definition of a self-dealing contract which is one occurring between the unit owners or association and the developer or its affiliate. Finally, plaintiff's termination was not timely as to Schnurmacher, making it invalid. Defendants' motion for summary judgment is, therefore, granted. Defendants' counterclaims declaring plaintiff's notice of termination and termination null and void, declaring that Schnurmacher is the owner in fee simple of the "Commercial Unit" and awarding defendants' the costs of the action are also granted. Each party shall bear its own attorneys' fees.